Argued and submitted June 4, 1999, affirmed July 12, 2000

Terry J. COOKE,
*Respondent,*

*v.*

FRESH EXPRESS FOODS CORPORATION, INC.,
an Oregon corporation;
Allen John Quicker;
and Joni Sue Quicker,
*Appellants.*

(95-CV-0268; CA A101185)

7 P3d 717

Robert E. Bluth argued the cause for appellants. With him on the briefs was Richard Billin.

Walter L. Cauble argued the cause for respondent. With him on the brief were Christopher L. Cauble and Schultz, Salisbury, Cauble & Dole.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

Defendants Allen John Quicker (John) and Joni Quicker (Joni) (defendants) appeal from a judgment in which the trial court found that they had acted oppressively toward plaintiff in the management and control of defendant Fresh Express Foods Corporation, Inc. (Fresh Express).[1] As a remedy, the court ordered defendants to purchase plaintiff's interest in Fresh Express at a price that the court set. Defendants raise issues concerning both the finding of oppressive conduct and the determination of the price for plaintiff's shares. On *de novo* review, we affirm.

■ We state the facts based on our review of the evidence in the record, aided by the trial court's findings, which reflect its ability to see the witnesses and evaluate their testimony.[2] Most of the facts are undisputed. John is Joni's father; plaintiff is her former husband. In the early 1980s John and Joni began a business of distributing fresh produce in the Grants Pass area. Plaintiff was originally employed elsewhere and only assisted in the business, but within a short time he left his other employment and began working with John and Joni full time. The business was originally a partnership, with John having a half interest and Joni and plaintiff together having the other half interest.

The business grew throughout the 1980s. In June 1990 John, Joni, and plaintiff incorporated it as Fresh Express. John received 50 percent of the stock, and Joni and plaintiff each received 25 percent.[3] John was the president of the corporation, Joni was the vice-president, and plaintiff

---

[1] The court entered an order of default against Fresh Express at the time of trial. However, when it entered judgment it dismissed all claims against Fresh Express. We therefore do not consider defendants' assignment of error relating to the default.

[2] Defendants appear to suggest that we should give the trial court's findings little weight because plaintiff's attorney drafted them. That argument fails to recognize that the findings are the findings of the court, not of a party. In this case the court followed the common practice of asking the winning party to prepare draft findings and then giving the losing party an opportunity to object to that draft. That procedure does not affect the weight that we give the findings that the trial court ultimately entered.

[3] Fresh Express did not actually issue stock certificates until 1995 in circumstances that we describe below.

was the secretary and treasurer. They constituted the three members of the board of directors, and each was also a Fresh Express employee. After the incorporation, the parties continued to function informally, at times discussing business decisions but not holding meetings of either the stockholders or the directors.

Fresh Express was the primary source of income for all three parties. Part of that income came from their salaries, but substantial additional amounts came as loans that the corporation made to them for various purposes, including paying their individual taxes on their portions of the corporation's retained earnings. Because Fresh Express elected to be a subchapter S corporation, which for tax purposes does not pay taxes itself but passes its income through to its shareholders, plaintiff and defendants were liable for taxes on those retained earnings whether or not the corporation actually distributed them. Without the loans, they would have had no corporate money to pay the taxes on that corporate income.

Joni and plaintiff separated at about the time of the incorporation. Despite the separation, the parties continued to cooperate in the business for a time, including after Joni began another relationship. That plaintiff and Joni worked in separate offices helped reduce the tension between them. However, that tension increased significantly beginning in June 1993 when, after starting a relationship with a Fresh Express employee, plaintiff filed for dissolution of the marriage. At that point, John and Joni began seeing a lawyer. In addition, John, without telling plaintiff, modified the corporate bank account to require two signatures on all checks. John and Joni each had a rubber stamp with the other's signature; plaintiff had no rubber stamp. The events that followed are the foundation for plaintiff's claim.

One of plaintiff's primary responsibilities was managing the company's delivery system, which included supervising the operation of its trucks. In December 1993, while plaintiff was on vacation, John discovered a notice on plaintiff's desk from the Public Utilities Commission (PUC) concerning a recent audit of the company's trucks. According to John, plaintiff had told him that the company passed the

audit with flying colors, but the PUC notice showed deficiencies that resulted in a fine of $6,000 and additional penalties of $4,000. Plaintiff had not paid those amounts, and that failure threatened Fresh Express with the loss of its PUC authority to operate. Such a loss, John testified, would have been devastating to the company. According to plaintiff, the problem was simply one of paperwork and the cost to the company was only $1,500. There is no documentary evidence in the record concerning this issue.

When plaintiff returned from vacation, John met with him and, acting as president of the company, terminated his employment. In doing so, John told plaintiff that he had checked the issue out legally and that he had the authority to terminate him. John gave plaintiff a written notice of termination that included the statement that "Fresh Express Foods Corporation has suffered monetary loss associated with [plaintiff's] position and this constitutes a Breach of Fiduciary Responsibility to the Corporation." It did not refer to a threatened loss of PUC operating authority. At trial, John testified that he did not know the definition of a fiduciary responsibility. The trial court found that John would not have terminated Joni for a comparable error. Rather, it concluded, the purpose for firing plaintiff was to exclude him from participating in the corporate business or receiving any benefits from the corporation. The court found that the reason for the exclusion was the breakdown of the marriage and the animosities that ensued thereafter.

Defendants correctly point out that there is no evidence that expressly supports the trial court's finding that John would not have fired Joni for a comparable error; the precise subject simply did not arise during the trial. However, in their testimony John and plaintiff disagreed concerning the nature and seriousness of plaintiff's error and its potential effect on the company. We treat the trial court's comment as, in part, reflecting its evaluation of that testimony and its conclusion that the effect of the error was closer to plaintiff's description than to John's. In addition, the written notice that John gave plaintiff, including its use of a crucial phase that John could not define, and the events that followed support the trial court's conclusion that the purpose of the termination was to exclude plaintiff from participation in

the business and from receiving any of its benefits. We agree with that conclusion.

After the termination, plaintiff received his unpaid wages and two weeks' severance pay. Except for the paper transaction that we describe below, plaintiff has received no money or other benefits from Fresh Express since his termination. Before the termination, the corporation distributed money to all of its shareholders that it treated as shareholder loans.[4] It continued to make those distributions to John and Joni, but it did not make them to plaintiff after his termination. Although plaintiff remained a corporate officer and director for almost two years, he was never again informed of or consulted about corporate business.

The court entered a judgment dissolving plaintiff's and Joni's marriage in August 1994. In doing so, it awarded Joni an equalizing judgment of approximately $27,000, plus post-judgment interest. Sometime in 1995, Joni's attorney conducted a judgment debtor examination of plaintiff, as a result of which Joni apparently concluded that plaintiff's stock in Fresh Express was his only available asset. After she indicated that she intended to execute against that stock, plaintiff filed this action on October 13, seeking among other things to enjoin her from doing so. Joni apparently saw the fact that the corporation had never issued stock certificates as an obstacle to an execution, as there was nothing tangible that the sheriff could seize. Because plaintiff was the corporate secretary, his cooperation was necessary for the corporation to issue certificates. Apparently in order to overcome that obstacle, John called a directors' meeting for November 2, 1995, for the purpose of electing officers.[5] At the meeting John and Joni first reelected John as president and Joni as vice-president. They then also elected Joni as secretary and treasurer.[6] Plaintiff abstained from all three votes.

---

[4] The "loans" occurred as shareholders withdrew money for various purposes during each year. At the end of the year, the corporation's accountant calculated the amount of the withdrawals, charged them on the company's books as loans, and, for tax purposes, assessed interest by adding it to each shareholder's loan account. Although the loans outstanding have reached almost $500,000 and have been greater than the corporation's retained earnings, it has never attempted to collect a shareholder loan.

[5] This was the first directors' meeting after plaintiff's discharge.

[6] The parties apparently treated the office of secretary-treasurer as a single office, although the corporate bylaws provide for secretary and treasurer as separate offices.

The meeting concluded with John stating, "As Secretary Treasurer, Joni, you have to get stock issued in the reasonably near future. I suggest that you do that as soon as it is reasonably convenient to do that. That is all for this meeting, I call the meeting adjourned." A few days later Joni issued a stock certificate to plaintiff.[7] Instead of sending the certificate to plaintiff, she immediately delivered it to the sheriff under a writ of garnishment on her judgment against plaintiff. In response, plaintiff obtained a temporary restraining order against proceeding with a sheriff's sale of the certificate. He was ultimately able to redeem the certificate, apparently before the hearing on his motion for a preliminary injunction, by borrowing money from his parents to pay the judgment.

In September 1996, defendants called a special shareholders' meeting,[8] at which the only order of business was to reduce the number of directors to two, over plaintiff's dissenting vote, and to elect John and Joni to those positions. During an informal discussion either before or immediately after that meeting, plaintiff commented to John's attorney that the tax notice that he had received indicated that the company owed him a considerable amount of money and asked if the company intended to pay it to him. After consulting with John, the attorney responded that John had decided not to make any more distributions to shareholders at that time.

After the shareholders' meeting ended and plaintiff left the room at their request, John and Joni held a directors' meeting.[9] The first order of business was to remove plaintiff "from all of his positions as an officer, employee and agent of the corporation." John and Joni then agreed, despite the attorney's statement to plaintiff, to distribute the corporation's entire accumulated adjustment account[10] to the shareholders by using it to reduce the outstanding shareholder loans. After the distribution, John and plaintiff continued to

---

[7] There is no evidence of whether Joni also issued certificates to John and herself, except that the certificate to plaintiff is numbered "3."

[8] This was the first shareholders' meeting after plaintiff's discharge.

[9] This was the second directors' meeting after plaintiff's discharge.

[10] The accumulated adjustments account apparently represented the corporation's retained earnings.

have loan balances, while Joni had a small surplus, which she did not withdraw. Finally, they agreed to purchase automobiles for John and Joni,[11] to increase John's salary from $54,000 per year to $120,000, effective at the beginning of that year, and to give John additional compensation of up to $5,000 for his legal fees in this action.

■     Plaintiff argues that these actions together constituted a course of oppressive conduct and that defendants breached their fiduciary duties to him by freezing him out of all participation in the corporation and depriving him of all of the benefits of being a stockholder. ORS 60.661(2)(b) provides that a court may dissolve a corporation when the directors or those in control "have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent[.]" Although there is not, and probably cannot be, a definitive definition of oppressive conduct under the statute, at least in a closely held corporation conduct that violates the majority's fiduciary duties to the minority is likely to be oppressive. *See Baker v. Commercial Body Builders*, 264 Or 614, 628-29, 507 P2d 387 (1973) (discussing *former* ORS 57.595, the predecessor statute to ORS 60.661); *Tifft v. Stevens*, 162 Or App 62, 77-78, 987 P2d 1 (1999). Cases that discuss either oppressive conduct or the majority's fiduciary duties are, thus, relevant to this question.

■     A number of cases make it clear that when

> "the majority shareholders of a closely held corporation use their control over the corporation to their own advantage and exclude the minority from the benefits of participating in the corporation, [in the absence of] a legitimate business purpose, the actions constitute a breach of their fiduciary duties of loyalty, good faith and fair dealing."

*Noakes v. Schoenborn*, 116 Or App 464, 472, 841 P2d 682 (1992). A finding that the majority shareholders have engaged in oppressive conduct under ORS 60.661 permits the court either to order a dissolution of the corporation or to award lesser appropriate relief, including requiring the

---

[11] Before plaintiff's termination, the corporation had paid only some automobile expenses for shareholders. Before the meeting, John bought a 1994 Cadillac in his own name, and Joni purchased a 1995 BMW in her own name. Thereafter, the corporation made the payments on those cars.

majority to buy out the minority's interest at a price that the court fixes. *See Baker*, 264 Or at 631-32. Because many things can constitute oppressive conduct or a breach of fiduciary duties, what matters is not so much matching the specific facts of one case to those of another but examining the pattern and intent of the majority and the effect on the minority of those specific facts. *See Chiles v. Robertson*, 94 Or App 604, 767 P2d 903, *on recons* 96 Or App 658, 774 P2d 500, *rev den* 308 Or 592 (1989) (the majority is more likely to fulfill its duties by acting with a fiduciary attitude than by trying to follow specific rules).

■ The facts of this case show a classic squeeze-out. The events fit into several of the categories that F. Hodge O'Neal describes in his pioneering treatise, F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Oppression of Minority Shareholders* (2d ed 1999).[12] Defendants withheld dividends and other benefits from plaintiff while preserving benefits for themselves.

> "The withholding of dividends or other return on one's participation in a business enterprise is an essential part of most squeeze-out efforts. * * *
>
> "* * * [W]itholding dividends can be especially devastating in an S corporation as all corporate income is passed through to the shareholders for tax purposes and shareholders are required to pay taxes on that income, but if no dividends are declared, the shareholders will have no cash from the enterprise with which to pay those taxes."

1 O'Neal, § 3:04, at 18. O'Neal notes that withholding dividends is particularly effective when the minority shareholder is a former employee who is unexpectedly discharged. *Id.* at 19. In addition, the "abrupt removal of a minority shareholder from positions of employment and management can be a devastatingly effective squeeze-out technique." *Id.* § 3:06, at 44-45. Finally, majority shareholders may siphon off corporate wealth by causing a corporation to pay the majority shareholders excessively high compensation, not

---

[12] In *Baker*, 264 Or at 628-29, the Supreme Court, relying in part on some of O'Neal's earlier writings, treated conduct that is similar to what we describe below as oppressive. In doing so, it noted that, by the very terms of the statute, oppressive conduct need not be either illegal or fraudulent.

only in salaries but in generous expense accounts and other fringe benefits. "Compensation of majority shareholders often is increased substantially soon after majority shareholders have eliminated a minority shareholder from the board of directors and have caused the corporation to discharge the shareholder as an employee." *Id.* § 3:07, at 67.

■■■ The existence of one or more of these characteristic signs of oppression does not necessarily mean that the majority has acted oppressively within the meaning of ORS 60.661(2)(b). Courts give significant deference to the majority's judgment in the business decisions that it makes, at least if the decisions appear to be genuine business decisions. As we have noted, attempts to define what oppressive conduct is, instead of what it is not, have proved elusive, and cases of this sort depend heavily on their specific facts. *See Weiner Investment Co. v. Weiner*, 105 Or App 339, 342-43, 804 P2d 1211 (1991). The court must evaluate the majority's actions, keeping in mind that, even if some actions may be individually justifiable, the actions in total may show a pattern of oppression that requires the court to provide a remedy to the minority.

The background of this case is a corporation that consisted of a father, a daughter, and a son-in-law and that came into existence at the very time that the marriage between the daughter and son-in-law began to dissolve. The events that we have described can best be understood as steps in a pattern whose ultimate goal was to eliminate plaintiff from all participation in what John and Joni saw as a family business. As plaintiff suggests in his brief, after firing him as an employee they tried also to fire him as a shareholder. That, however, is not as easy to achieve.

■■ Although there were some previous signs of tension, the first action that might fit into a pattern of oppression was John's termination of plaintiff's employment with the company. Plaintiff does not challenge the dismissal as a matter of employment law. However, it is unusual for a close corporation to terminate the employment of a 25-percent shareholder and corporate director for a mistake of the sort that John described, particularly in the absence of evidence of previous problems and accompanying warnings. The written

notice of termination appears to be more an attempt to create a paper justification for the termination than a statement of the actual reasons.[13] After the termination, defendants excluded plaintiff from all involvement in the corporation and its business and all participation in its profits, things that relate to his continuing status as a shareholder and a director, not to his terminated status as an employee.[14] Those actions suggest that the purpose of the termination was not to remove an unsatisfactory employee but, rather, to exclude plaintiff from participation in the corporation.

Defendants nominally recognized plaintiff's continuing status after his termination only when they had to follow corporate forms in order to benefit themselves at his expense. The sole purpose for the directors' meeting in November 1995 was to produce a stock certificate that Joni could garnish; John's comments at the end of the meeting make that point clear. There had never previously been any concern about the lack of certificates. Collecting a judgment arising out of the dissolution of Joni's marriage to plaintiff had no relationship to the corporation or its business. Joni and John simply used their control over the corporation to make it possible for her to do so. The way that they chose had the additional advantage, from their perspective, of carrying the possibility that Joni could take over plaintiff's shares at a deep discount, thus entirely eliminating him from the corporation.

Finally, in September 1996 defendants acted to ensure that they would permanently receive all benefits of the corporation. They began by replacing plaintiff as a director and reducing the number of directors to two. Although that was not necessarily improper in itself, their first actions as the sole directors of Fresh Express showed their purpose to exclude plaintiff from any share in the corporation other than

---

[13] Defendants emphasize that plaintiff was an at-will employee and that the termination, thus, was not wrongful in the breach of contract or tort sense. Assuming that they are correct, those facts do not mean that the termination is irrelevant to whether they engaged in oppressive conduct toward plaintiff in his capacity as a shareholder.

[14] It appears that, after the termination, plaintiff's only "benefit" from being a shareholder was his obligation to pay taxes on his passed-through share of the company's profits without receiving any money to do so.

his tax liabilities. They first removed plaintiff from any office or agency with the corporation and then took a number of actions to direct all corporate income to themselves. Despite having told plaintiff that there would be no corporate distributions, defendants distributed the entire retained earnings through a paper transaction that ensured that the corporate books would show no source for making any cash distribution to plaintiff. They then more than doubled John's salary, with the result that he received his income from the corporation as an expense that would reduce its profits rather than as a distribution of profits. Finally, they had the corporation pay for their recently purchased automobiles, again adding to the corporation's expenses and reducing its profits for their benefit.

Defendants' explanations for their actions have the air more of attempted justifications than of statements of actual reasons. They first argue, relying on *Zidell v. Zidell, Inc. (24128),* 277 Or 413, 560 P2d 1086 (1977), that a court should not second-guess a plausible business reason for a corporate decision. That is not precisely what the court held in *Zidell,* nor are the facts of that case comparable to this one. The only issue in *Zidell* was the plaintiff's attack on the defendant corporations' conservative dividend policy. The plaintiff, who had resigned his employment after the corporations denied him a substantial raise, argued that the relatively low dividends were the result of the directors' bad faith. The court noted that the defendants presented a large amount of evidence to support their stated business reasons for that policy. In addition, the plaintiff was not the victim of a squeeze-out but had left his positions voluntarily. Although the defendants were subchapter S corporations, the court was not convinced that the directors had acted in bad faith or were employing starvation tactics to force the sale of the plaintiff's shares at an unreasonably low amount. The court, that is, examined the defendants' actions and found them reasonable and not oppressive; that is not the same as accepting any plausible business reason.[15]

[15] In *Iwasaki v. Iwasaki Bros.,* 58 Or App 543, 547, 649 P2d 598 (1982), we noted that the plaintiff did not challenge the defendant's plausible business reason for failing to distribute an S corporation's earnings. That does not mean that we must accept any plausible reason without regard to the rest of the evidence in the

In this case the business reasons that defendants present for their actions, other than terminating plaintiff's employment, are limited to such things as an alleged policy to reduce the corporation's debt ratio and a suggestion from an Internal Revenue Service examiner, in an audit of the 1993 corporate tax return, that the corporation distribute some of its retained earnings. They also point to evidence that $120,000 is not an unreasonable salary for the president of a firm of the size of Fresh Express. We do not find this evidence sufficient to overcome the evidence of oppressive conduct.[16] More than doubling John's salary does not aid in reducing the corporation's debt ratio, while the IRS suggestion, based on the review of a previous tax year, does not explain why defendants distributed the corporation's entire retained earnings in a way that avoided any practical benefit to plaintiff. Finally, as plaintiff's expert appraiser pointed out, in an S corporation the owners tend to look at salaries and distributions as simply different ways of receiving the same income. Thus, increasing John's salary did not necessarily increase his income; like the decision for the corporation to pay for cars that John and Joni were purchasing, it simply gave him corporate benefits in a form that reduced the money that a nonemployee shareholder like plaintiff might otherwise claim. Finally, the timing of those actions in itself rebuts any suggestion that they were taken simply for business reasons or to follow the practices of comparable businesses.

In summary, we conclude that defendants consistently acted to further their individual interests, not the interests of the corporation, and without regard to their fiduciary duties to plaintiff. They did so either knowing or intending that their actions would harm plaintiff, among other ways by excluding him from any benefits of his ownership of one quarter of the corporate stock. They thereby violated their fiduciary duties to him and engaged in oppressive conduct.

---

record when the plaintiff does challenge the majority's purposes. In addition, the facts in *Iwasaki* are quite different from those in this case. *See also Tifft*, 162 Or App at 79-80.

[16] Defendants do not even attempt to suggest a plausible business reason for issuing a stock certificate solely to allow Joni to execute against it, thereby threatening plaintiff's continuing status as a stockholder.

■    Under ORS 60.661, the trial court had the authority to choose a remedy for defendants' actions; we agree with it that requiring defendants to purchase plaintiff's shares is the preferable option. A purchase will disentangle the parties' affairs while keeping the corporation a going concern; dissolution would not benefit anyone, and plaintiff did not seek it at trial. Defendants, however, raise some issues concerning the court's determination of the price that defendants must pay.

■    Plaintiff presented extensive testimony from an expert appraiser concerning the value of plaintiff's shares in the context of a judicial remedy for oppressive conduct. In doing so, the appraiser determined the value of the company as a profitable going business, made certain adjustments for excessive expenses, and determined plaintiff's one-quarter share of the total. The expert then added plaintiff's unpaid wages since his termination as a way of reflecting the benefits that he did not receive after that date. The only directly contradictory evidence that defendants presented came from the company's accountant, who calculated plaintiff's proportionate share of its liquidation value. In this case, however, the issue is the fair value of plaintiff's shares in a profitable going concern, which is not necessarily tied to the company's liquidation value; that evidence, thus, has limited relevance. The court ordered defendants to purchase plaintiff's shares at the price that the expert recommended.

■  ■  Defendants assign error to including plaintiff's unpaid wages in determining the value of his shares. They argue that doing so treats plaintiff as though he were still an employee, thereby ignoring that John effectively terminated him. However, the court did not award that amount as compensation for plaintiff's services. Rather, following the expert's approach, it recognized that the owners of close subchapter S corporations generally receive their benefits in a variety of generally interchangeable ways, including salaries, "loans," and distributions of profits. As a result of defendants' oppressive conduct, plaintiff received none of those benefits after his termination as an employee. In the circumstances of this case, and based on the evidence before the trial court, plaintiff's former salary—which reflected only some of the benefits that he received as an employee—is an adequate

approximation of the losses that he suffered. The trial court did not err by including it in the price that defendants must pay. Finally, because defendants must purchase plaintiff's shares as a remedy for their misconduct, and the price for plaintiff's shares is therefore based on their fair value rather than their fair market value, either a minority or marketability discount would be inappropriate. *Chiles*, 94 Or App at 643.

Affirmed.