Argued and submitted November 6, 2000, remanded in part; otherwise affirmed
March 28, 2001

Dan A. HAYES,
*Appellant,*

*v.*

OLMSTED & ASSOCIATES, INC.,
dba Performance Northwest of Oregon,
*Respondent,*

*and*

Arthur K. OLMSTED
and David P. Arbanas,
*Defendants.*

(9709-07330; CA A106401)

21 P3d 178

Kim T. Buckley argued the cause for appellant. With him on the opening brief were Michael J. Esler and Esler, Stephens & Buckley. With him on the reply brief was Esler, Stephens & Buckley.

Susan D. Marmaduke argued the cause for respondent. With her on the brief was James, Denecke, Urrutia, Marmaduke & Carlton, P.C.

Before Wollheim, Presiding Judge, and Deits,* Chief Judge, and Brewer, Judge.

BREWER, J.

---

* Deits, C. J., *vice* De Muniz, P. J.

**BREWER, J.**

Plaintiff Dan Hayes brought this action against defendants Arthur Olmstead, David Arbanas, and Olmstead & Associates, Inc. (O&A) for relief from alleged minority shareholder oppression.[1] Plaintiff is a former employee, officer, director, and current shareholder of O&A, a successful food brokerage firm. Olmstead and Arbanas are directors and officers of O&A, and together, during the relevant time, held a majority block of its voting shares. Plaintiff was discharged from employment on June 30, 1997, one year before his planned retirement date. O&A offered plaintiff a severance package, which included the purchase of his shares, but he rejected it. Plaintiff then commenced this action against O&A and the individual defendants. Plaintiff sought, among other remedies, judicial dissolution of O&A under ORS 60.661. Plaintiff alleged that Olmstead and Arbanas had engaged in oppressive conduct toward him, in violation of ORS 60.661(2)(b). Plaintiff's complaint also included claims for misapplication of corporate assets, breach of fiduciary duty, specific performance, breach of contract, and interference with prospective economic advantage.

The parties settled most of the issues in the case. In exchange for a partial release, O&A agreed to pay plaintiff back pay, forward pay, and his attorney fees. O&A also agreed to cover plaintiff's medical insurance until plaintiff reaches the age of 65 and to contribute amounts designated by plaintiff into a retirement account. Finally, O&A agreed to purchase plaintiff's 6,852 voting and nonvoting shares, at a price to be determined by the trial court.

The settlement agreement expressly reserved for judicial determination "any claims [plaintiff] might have against [O&A] in whatever legal theory for the value of his stock." Paragraph 3 of the agreement provided:

> "The parties agree that Judge Bearden or his designee may decide all other issues relating to the value of the stock including, but not limited to, whether defendants have engaged in oppressive conduct that bears on the value of

---

[1] Defendant O&A is the only respondent on appeal.

the stock, if relevant, or the availability of any discounts to defendants from the value of the stock, and whether the payment of excess compensation and personal expenses to Olmstead, Arbanas and [O&A director Jack] Wynne should be 'recaptured' by the corporation or included as an asset of the corporation for the purpose of determining the value of [plaintiff's] stock."

The agreement further provided that plaintiff withdrew his demands to liquidate the corporation and to recapture alleged excessive salaries and bonuses paid to Olmstead and Arbanas, but stated that the withdrawal of those demands was not "a waiver or abandonment of [plaintiff's] claim that defendant engaged in oppressive conduct *solely as it may relate to the value of [plaintiff's] stock.*" (Emphasis added.) The parties agreed that the judgment for the value of plaintiff's shares would be payable in equal monthly installments for ten years from the date of the judgment, with interest on the declining balance at 6.5 percent per annum. In sum, although the parties agreed that O&A will purchase plaintiff's shares, and further agreed on the terms of payment, they did not agree either on the value of the shares or on the method by which that value would be determined.

As required by the settlement agreement, the issue of the shares' value was tried to the court. The trial court found that "minority shareholders were not given the formal and required opportunities to participate in or comment on major changes in the direction of the company. This appears to be 'oppressive conduct' as defined in the case law." The court also determined that, "[b]y not having annual meetings with proper advance notice and agenda preparation this virtually guarantees that minority shareholders will not have a voice in the company requiring a lawsuit to get redress if a dispute arises." In deciding the value of plaintiff's shares, the court found evidence concerning the recent redemption of another minority shareholder's stock in O&A most persuasive. The court based its valuation on that transaction and on a later transaction in which the corporation paid $67 per share to redeem shares of a departing employee. Plaintiff asserts in his single assignment of error that the appropriate value for his shares is a proportionate fraction of O&A's going

concern value, which plaintiff's expert witness determined was $171.35 per share.

Plaintiff's theory at trial and on appeal is that, during the last two years of his employment with O&A, majority shareholders Olmstead and Arbanas and director Jack Wynne acted oppressively toward him by excluding him from top management decisions, taking excessive bonuses, refusing to provide information concerning bonuses and salaries, and, ultimately, terminating his employment. Plaintiff asserts that, as a remedy for that oppressive conduct, O&A should be required to purchase his stock at its "fair and reasonable value," which, in his view, is the value of his proportionate interest in the corporation as a going concern, without consideration of any minority or marketability discounts that might be applicable in other circumstances.

Not surprisingly, O&A has a different perspective of the case. In the first instance, it cross-assigns error to the trial court's determination that Olmstead and Arbanas engaged in oppressive conduct. Alternatively, it argues that, under the settlement agreement, evidence of oppression may be considered only for the purpose of determining its effect on the value of plaintiff's shares. According to O&A, the conduct of Olmstead and Arbanas, even if oppressive, had no effect on the value of plaintiff's shares, and the purchase price should be based on the $67 per share value established under the corporation's stock purchase agreement in 1997.

Assuming, however, that oppression did affect the value of plaintiff's stock, O&A also asserts that the price must be fair and reasonable *in the circumstances*. It argues that the court must consider the gravity of the alleged misconduct; plaintiff's acquiescence in, and the extent to which he has benefitted from, that misconduct; the extent to which plaintiff has previously been compensated under the settlement agreement; the share value established by the parties in the stock purchase agreement, which has been consistently applied in redeeming the shares of other shareholders; and the impact that the buy-out will have on O&A's viability as a going concern. O&A points out that paragraph 3 of the settlement agreement authorized the trial court to decide "whether defendants have engaged in oppressive conduct

*solely as it may relate to the value of [plaintiff's] stock."* (Emphasis added.) Because, according to O&A, any oppressive acts committed by the majority shareholders consisted primarily of technical noncompliance with corporate formalities in which plaintiff acquiesced and that caused no harm to him, it is not reasonable to base the purchase price on the corporation's going concern value.

■    At the outset, we reject the premise that paragraph 3 of the parties' agreement limits the purpose for which evidence of oppressive conduct may be considered to its *effect* on the value of the shares, *i.e.*, whether the oppressive acts reduced the value of the shares. The agreement permits plaintiff to contend for a value under *any* appropriate legal theory. Plaintiff relies on oppression cases in which the courts have determined the "fair value" of corporate stock based on its pro rata share of the value of the corporation as a going concern. *See, e.g., Cooke v. Fresh Express Foods Corp.*, 169 Or App 101, 114, 7 P3d 717 (2000). If plaintiff has established that Olmstead and Arbanas oppressed him, the value of plaintiff's shares may be determined according to principles that are applicable in other oppression cases. Accordingly, the preliminary question is whether Olmstead and Arbanas oppressed plaintiff as a minority shareholder.

2.    Under the settlement agreement, plaintiff has abandoned his quest to dissolve O&A. However, the dissolution statute, ORS 60.661(2), and cases decided under it remains of assistance in determining whether Olmstead and Arbanas engaged in oppressive conduct.[2] When appropriate, a court may order an involuntary purchase of a minority shareholder's interest in lieu of corporate dissolution as a remedy for the oppressive conduct. *See Baker v. Commercial Body Builders,* 264 Or 614, 631-33, 507 P2d 387 (1973) (in action for dissolution of closely held corporation under predecessor statute, ORS 57.595 (1973), court was not limited to remedy of dissolving corporation but could consider equities of case to determine other appropriate remedies, including purchase of minority shareholder's stock).

---

[2] ORS 60.661(2)(b) provides that a circuit court may dissolve a corporation when "[t]he directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, *oppressive* or fraudulent[.]" (Emphasis added.)

The legislature has not defined "oppression" for present purposes. In *Baker*, the court said that general definitions of the term are of little value in a specific case. *Id.* at 628. Rather, courts must determine on a case-by-case basis whether the conduct complained of rises to the level of oppression, which we have variously described as "nebulous," *Weiner Investment Co. v. Weiner*, 105 Or App 339, 343, 804 P2d 1211 (1991), and as lacking "definitive definition," *Cooke*, 169 Or App at 110; *see also Tifft v. Stevens*, 162 Or App 62, 987 P2d 1 (1999). In *Baker*, the Supreme Court cited common-law authorities describing oppressive conduct as

> "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." 264 Or at 628 (citation and internal quotation marks omitted).

Oppression of minority shareholders in closely held corporations is frequently linked to breaches of fiduciary duty. *See, e.g., Campbell v. Ford Industries, Inc.*, 266 Or 479, 513 P2d 1153 (1973). As is the case among partners, those in control of the affairs of a closely held corporation have fiduciary duties of good faith, fair dealing, and full disclosure toward minority shareholders. *Zidell v. Zidell, Inc.*, 277 Or 413, 418, 560 P2d 1086 (1977); *Chiles v. Robertson*, 94 Or App 604, 619, 767 P2d 903, *on recons* 96 Or App 658, 774 P2d 500, *rev den* 308 Or 592 (1989). In *Noakes v. Schoenborn*, 116 Or App 464, 472, 841 P2d 682 (1992), we said that a breach of fiduciary duty occurs when "the majority shareholders of a closely held corporation use their control over the corporation to their own advantage and exclude the minority from the benefits of participating in the corporation, [in the absence of] a legitimate business purpose * * *." A breach of fiduciary duty by those who control a closely held corporation normally constitutes oppression. *Cooke*, 169 Or App at 108.

The lack of marketability of the shares of a closely held corporation means that minority shareholders are especially vulnerable to the loss of their investments. F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Oppression of*

*Minority Shareholders*, § 7:02, 6 (2d ed 1999). The "squeeze-out" tactics of majority shareholders often deprive minority shareholders of management participation, employment income or other advantages that they reasonably have come to expect, and which are the essential benefits of their investment. *Id.* at § 3:06, 44. Nonetheless, in *Cooke*, we emphasized that the court must defer to the business decisions made by the majority shareholders of a close corporation, as long as they are genuine. 169 Or App at 110. Moreover, the existence of one or more badges of oppression in isolation does not necessarily justify relief. *Id.* Instead, we examine the pattern of conduct of those in control and the effect of that conduct on the minority to determine whether, in sum, they show oppression. *Id.* at 108-10.

With the foregoing principles in mind, we turn to the evidence in this case. O&A was formed in 1978 as a partnership consisting of Arthur Olmstead, Robert Crites and Cash Frackiewicz. Plaintiff joined the firm as a partner in 1979, and in 1981 the partners decided to incorporate. The voting shareholders of the corporation were plaintiff, Olmstead, Crites, Frackiewicz, and John Fowlks, who joined the business in 1982. The voting shareholders were also the officers and the managers of the corporation. Olmstead was the president and general manager, and plaintiff served over the years as vice-president, treasurer and secretary. At the time of corporate formation, he acquired approximately 14 percent of O&A's outstanding shares.

The corporation's lawyer prepared the Stock Purchase Agreement (SPA) among the corporation and its shareholders. The SPA directed that "[t]he parties to this Agreement shall, at least annually, and more frequently as may be determined by the parties, set the per share value of stock of the Corporation for the purposes of this Agreement." It also required any terminated employee to offer his or her stock to O&A. However, O&A was not required to accept the offer. In addition, O&A could "accept" the offer at the price per share established under the SPA, if the shareholder's offering price was higher.[3]

---

[3] The agreement provided that any employee

"whose employment with Corporation is terminated for any reason shall, immediately after such termination, offer all of his stock in Corporation to

Originally, Olmstead held 51 percent of the voting shares. In 1991, plaintiff and other shareholders became concerned about Olmstead's dominance of corporate affairs to the exclusion of other shareholders and directors. Under pressure, Olmstead transferred 5 voting and 540 nonvoting shares to Arbanas, who had joined the company in 1988, for approximately $40 per share. Management of the business also shifted from Olmstead to a "management team," which consisted of the voting shareholders and directors, with Fowlks serving as president and general manager. Olmstead remained in place as chief executive officer, but the transaction gave voting shareholder block control to Crites, Frackiewicz, and plaintiff.

During 1993 and 1994, O&A engaged in negotiations with another food brokerage firm, Christy Damon & Associates, to explore a possible merger of their businesses. In that context, O&A valued its shares in accordance with an industry rule-of-thumb formula amounting to one times its annual gross revenues, minus its nonoperating debt. In 1994, that formula yielded a $64 value per share for O&A's stock. Ultimately, the negotiations with Christy Damon fell through. However, in June 1994, the shareholders set the SPA share value at $64, the same value then yielded by the rule-of-thumb formula. On June 30, O&A redeemed Fowlks's shares on his retirement and also redeemed approximately 10 percent of Olmstead's shares. In both cases, the redemption price was $64 per share. After Fowlks retired, Arbanas became president and general manager of O&A.

Until June 1995, the annual salaries of the voting shareholders were relatively comparable, ranging from $100,000 to $130,000. Until that time, the voting shareholders had annually distributed approximately equal cash bonuses among themselves. In June 1995, the management team agreed to implement a more achievement-oriented bonus plan. In 1995, plaintiff did not achieve his performance goals, but because the company had had a profitable year the management team voted to pay him a bonus anyway. Also in

Corporation. * * * Corporation shall have the right to accept said offer to sell at any time within thirty [30] days after receipt of such offer with the purchase price of said stock being the lesser of the price in the offer, if any, or the price determined in accordance with the terms of Article IV."

June 1995, Arbanas sought and received, as compensation, an additional bonus beyond the bonuses taken by the other shareholders. The Board of Directors approved a bonus for Arbanas of either $10,000 in cash or 60 shares of voting stock. Arbanas initially decided to accept cash. The corporation's lawyer had prepared corporate minutes reflecting a stock bonus and, on June 30, also had prepared a resolution memorializing the issuance of 60 shares to Arbanas. Arbanas notified the attorney of his decision to accept the cash bonus and the stock bonus resolution was rescinded.

The food brokerage industry changed in the mid-1990s as clients became more interested in working with regional brokerages. In early 1996, in an effort to retain a key client, Pillsbury Foods, O&A acquired Performance Northwest, another food brokerage firm. O&A doubled its revenues as a result of the acquisition. It also undertook an acquisition debt to Performance Northwest's owner, Steven Ness, that was amortized over seven years and payable in the amount of $57,750 per month. O&A agreed to limit payments for the future redemption of its shares during the Ness pay-off period. Plaintiff and other shareholders of O&A had long regarded the prospective redemption of their shares as a pension of sorts. Because plaintiff and Crites intended to retire in the relatively near future, the anticipated redemption of their stock was expressly exempted from the Performance Northwest limitation.

The Performance Northwest transaction resulted in a significant restructuring of O&A. Before the acquisition, O&A's management team had consisted of its voting shareholders, who were also the directors of the corporation. Those managers had met weekly to discuss and make decisions concerning business operations. After the acquisition, however, Arbanas testified that management control shifted to an *ad hoc* management group" consisting of Olmstead, Arbanas, and Jack Wynne,[4] which became known as the Executive Committee. The corporation's controller, Horne, was also a member of the Executive Committee, which met weekly.

---

[4] Wynne had been president of Performance Northwest's food brokerage division before the acquisition. Although he did not become an O&A shareholder, Wynne became its chief executive officer in 1996.

Plaintiff and other managers also met weekly, on Mondays, to discuss operations, but they were not included in Executive Committee meetings. After the Executive Committee assumed control over O&A's affairs, there were no further meetings of the Board of Directors. Plaintiff testified that he did not immediately learn that primary management functions had shifted to a different group and became aware of the change only sometime later in 1996.

Arbanas testified that the change in management structure relieved plaintiff, Crites, and Frackiewicz of their top management functions, because the other voting shareholders had lost confidence in their ability to guide O&A in a changing, competitive, and technological environment. According to Arbanas, the Executive Committee believed that plaintiff could competently manage his department but lacked confidence in his ability and interest in attracting new business. A file memorandum prepared by O&A's lawyer dated June 24, 1996, stated that "[Olmstead] has in mind the removal of [Crites, plaintiff, and Frackiewicz] as officers of the corporation to facilitate bonus paying procedure, such that bonuses due them can be deferred until after the end of the fiscal year." A memorandum of corporate action dated June 25 memorialized the removal of plaintiff, Crites, and Frackiewicz as officers and the election of Olmstead, Arbanas, and Wynne in their places. Plaintiff's signature is on the document, but he testified that he did not learn that he had been removed as an officer until some time later.[5]

Also in June 1996, Olmstead urged Arbanas to take voting shares as his 1995 bonus in lieu of the cash that he had already received; Arbanas agreed and issued a stock certificate for the shares, signing both as president and secretary of O&A.[6] Arbanas executed a promissory note to repay the cash bonus that he previously had received, but he had not made

---

[5] Defendants made no effort to contradict plaintiff's testimony on that point. There was no evidence as to when the June 25 memorandum of corporate action was actually executed.

[6] Arbanas testified that he was neither president nor secretary at the time and, thus, had executed the certificate in error.

any payments on the note by the time of trial. With the issuance of the additional 60 shares to Arbanas, shareholder voting control shifted to Arbanas and Olmstead, although Arbanas testified that he has never voted the additional shares at a shareholder meeting. The other shareholders, including plaintiff, were not informed that Arbanas had received the shares.

In 1996, bonuses were paid to all department managers pursuant to the new bonus plan. As in 1995, plaintiff again failed to achieve his goals but received a bonus nonetheless. In December 1996, after paying all other bonuses, the members of the Executive Committee met separately and secretly to fix their own bonuses for the fiscal year ending June 30, 1996. Although bonuses paid to other shareholders and managers for 1996 ranged from $10,000 to $30,000 each, the Executive Committee members each received bonuses that year exceeding $100,000. Arbanas and Wynne testified that the bonus payments were confidential and, therefore, the Executive Committee did not disclose any information concerning the bonuses paid to its members to the other voting shareholders. In late 1996, plaintiff requested information about bonus payments made that year, but his request was refused. Olmstead testified that plaintiff could not be trusted to keep information confidential, "so we didn't tell him what was going on usually." There was no evidence, however, that plaintiff had ever revealed confidences concerning salaries and bonuses.

In late 1996 and early 1997, plaintiff complained about his exclusion from top level management decisions. He attempted to obtain financial records from Horne, who told plaintiff that the records were not available to him and that he should talk to the corporation's attorney. In early 1997, the corporation's attorney provided plaintiff with copies of various corporate minutes but did not furnish him with any records of bonus payments to Executive Committee members. When he examined the minutes, plaintiff first learned that Arbanas had ultimately received stock for his 1995 bonus. At the same time, plaintiff also realized that he, Frackiewicz, and Crites no longer held voting control of O&A. In April, the attorney noted in a file memorandum that "[t]he

importance is that [Arbanas] and [Olmstead] together own more than 50 percent of the voting stock of O&A."

In early 1997, O&A learned that it would lose Pillsbury Foods as a client and, with it, annual revenues exceeding $1 million. In order to maintain the corporation's financial footing, the executive committee decided to lay off 14 employees, among them plaintiff. Olmstead testified that in April 1997, plaintiff's primary client notified O&A that if plaintiff was not removed from responsibility for its account, it would terminate O&A's services. On April 2, the Executive Committee discussed job performance issues with plaintiff. On April 4, the Executive Committee sent a memorandum to plaintiff outlining concerns about his performance, specifically his low revenues in contrast to the production of other managers. Olmstead, Arbanas, and Wynne asked plaintiff to address those concerns and to improve his financial performance "immediately." On April 17, plaintiff responded with a memorandum explaining his view of the decline in income of one line and the inability to meet projections. Plaintiff also made suggestions for improved productivity. When plaintiff met with the Executive Committee on April 17, he was told that his position would be eliminated as of May 31. Plaintiff worked and received a salary through June 30, 1997, however, and continued to serve his primary client until then. That client ultimately took its business elsewhere, but not until several months after plaintiff's termination.

In the spring of 1997, O&A offered plaintiff a severance package that included the redemption of his stock at $64 per share.[7] Plaintiff objected, because he did not want to retire ahead of schedule and because he believed that the corporation's value had increased since 1994, when the $64 per share value had been established. On May 14, Olmstead sent plaintiff a memorandum, advising him that if he did not accept the proposed severance package, it would be withdrawn. Plaintiff testified that, at that point, he had not seen a financial statement in two and one-half years and he believed the value of the shares had increased significantly. He therefore rejected O&A's proposal.

---

[7] As was the corporate custom, the proposal provided for the imputation of interest in the principal price per share.

In August 1997, plaintiff received notice of a meeting in which shareholders would be asked to approve a value for the shares under the SPA. He chose not to attend, citing procedural irregularities. A majority of the voting shareholders determined at that meeting to value the corporation's stock under the SPA at $67 per share, with interest imputed. The company then offered to purchase plaintiff's stock for $67 per share. Plaintiff also rejected that offer. In the fall of 1997, plaintiff was removed from the Board of Directors.

Also in 1997, O&A entered into acquisition negotiations with Advantage Sales & Marketing LLC (the Advantage Group), a consortium of food brokerages. The Advantage Group proposed to obtain an option that would entitle its members to purchase all outstanding O&A stock. The Advantage Group's written proposal called for an acquisition price and terms "equal to net commissions of the member's business for the 12-month period prior to the first day of the month said right to purchase arises, less Non-Operating Debt and less any sums due Optionor as a return of Capital as a result of being a Member of the Company." The proposal essentially adopted the rule-of-thumb valuation formula that O&A had used in external dealings in the past. O&A's management favored the proposal, but because it could not obtain the unanimous approval of its shareholders and because the Ness agreement prohibited O&A from changing its structure without Ness's approval, no option was granted. Nonetheless, negotiations between O&A and the Advantage Group remained ongoing at the time of trial.

In December 1997, based on O&A's supposed recovery from the loss of the Pillsbury account, Olmstead, Arbanas, and Wynn secretly paid themselves annual bonuses of approximately $100,000 each.

■ The trial court found that plaintiff was the victim of oppression "because minority shareholders were not given the formal and required opportunities to participate in or comment upon major changes in direction of [O&A]." We agree. Because they believed that they were most fit to govern corporate affairs, Olmstead and Arbanas assumed control of O&A by creating a *de facto* Executive Committee in violation of the bylaws. From 1995 to 1997, when plaintiff

was fired, the Executive Committee did not observe corporate formalities and failed to hold regular meetings of the corporation's Board of Directors and shareholders. Executive Committee members paid themselves bonuses that were not authorized by or reported to the Board of Directors, also in violation of the bylaws. They kept their bonuses secret from the other shareholders and board members, despite plaintiff's requests for the bonus information, again in violation of the bylaws. In short, the Executive Committee, led by Olmstead and Arbanas, systematically disregarded the formalities and substance of O&A's organic governing documents.

When plaintiff complained about his exclusion from corporate decisions and information, the Executive Committee fired him, purportedly because of plaintiff's poor job performance over the preceding 10 years and in order to reduce expenses. However, several factors suggest that those reasons were at least partly pretextual. First, plaintiff's supposedly unhappy client stayed with O&A until after plaintiff was fired *and then left*. That fact supports plaintiff's testimony that the client was loyal to him. Second, if plaintiff's performance had been poor throughout the preceding 10 years, it seems implausible that a "business-based" decision to fire him would be made only after plaintiff began to complain about his exclusion from corporate affairs. Third, if the corporation were truly in desperate financial straits in mid-1997, and thus needed to make significant employee layoffs, its "recovery" in time to pay six figure year-end bonuses to Executive Committee members seems contrived. Fourth, by firing plaintiff, the Executive Committee was in a position to invoke the SPA provision requiring plaintiff to offer his shares for redemption at the SPA price. Based on those questionable circumstances, it is reasonable to infer that the Executive Committee discharged plaintiff—at least in part—because (1) it no longer wanted to share corporate profits and information with him, and (2) he had begun to question his exclusion from corporate decisions.

O&A argues that in no single decision did Olmstead and Arbanas *exercise by vote* their majority control so as to oppress plaintiff as a minority shareholder. If that is true, it is so largely because corporate decisions adversely affecting plaintiff were made not by vote of the board or shareholders

but, instead, were made by the Executive Committee beyond the oversight of prescribed corporate governance. In *Stringer v. Car Data Systems, Inc.*, 108 Or App 523, 816 P2d 677, *on recons* 110 Or App 14, 821 P2d 418 (1991), *aff'd on other grounds* 314 Or 576, 841 P2d 1183 (1992), we said that, in assessing whether unlawful control has been exercised, the question is not whether a group of shareholders happens to have outvoted another group on a particular occasion but "whether a given shareholder or small number of shareholders has the requisite power to dictate or dominate corporate decisions." 108 Or App at 527. Although Olmstead and Arbanas may never have "voted" their shares, they achieved dominance and control through the decisions of the Executive Committee.

O&A further remonstrates that no decision of the Executive Committee had an adverse impact on plaintiff's investment and that, in fact, O&A acted generously by paying him bonuses that he had not earned and by offering to buy his shares. It also contends that, in light of plaintiff's failure to assert his rights as a shareholder or director to call meetings of either body, he may not now complain about his lack of participation in corporate decisions. Similarly, although the trial court found that Olmstead and Arbanas had engaged in oppressive conduct, it also remarked on plaintiff's passive acceptance of his plight: "[P]laintiff himself sat on his rights, not out of fear or other similar concern, but because he felt things were going along quite well." The trial court found that O&A's failure to revalue its shares annually was as much plaintiff's fault as that of the other shareholders, and that "plaintiff should not be rewarded for being extraordinarily dilatory." In our view, that theme deserves less emphasis.

Although plaintiff did not insist on the observation of corporate formalities, he was not responsible for Executive Committee decisions made without his knowledge or approval. Plaintiff testified that he did not demand board meetings because he was not unhappy with the way things were going. On a superficial level, *things were going well*. Plaintiff was receiving bonuses and the company was expanding its business following the acquisition of Performance Northwest. However, plaintiff did not know that the

Executive Committee had paid large unauthorized bonuses to its members or that Olmstead and Arbanas had acquired voting shareholder control.[8] When plaintiff sought information about those matters, the Executive Committee fired him. That decision, in turn, further excluded plaintiff from corporate affairs and triggered the possible redemption of his shares under the SPA. In sum, plaintiff's inaction was the product of a surface impression of fair dealing created by Olmstead and Arbanas that evaporated when plaintiff's acquiescence ceased.

We reject O&A's assertion that plaintiff was not harmed by the Executive Committee's decision to award exceptional bonuses to its members, because it did not affect the value of his shares. At Arbanas's instigation, the former management team, including plaintiff, had developed a bonus plan in which plaintiff participated. The Executive Committee rewarded its own members outside that plan. Even assuming that the unauthorized bonuses did not affect the value of plaintiff's stock, he was harmed by being excluded from the decision-making process and from the pool of eligible recipients. The Executive Committee's assumption of control, contrary to established practice and the corporation's bylaws, misled plaintiff into believing that corporate business was being conducted in a previously approved manner. Although each Executive Committee decision—viewed in isolation—may not have adversely affected the corporation or the value of plaintiff's stock, taken together, the committee's actions had the effect of excluding plaintiff from the benefits of participation in corporate affairs. On *de novo* review, we find that the conduct of the Executive Committee, spearheaded by Olmstead and Arbanas, was oppressive toward plaintiff.

Having determined that Olmstead and Arbanas engaged in oppression, we next consider the appropriate price for plaintiff's stock under the settlement agreement. In

[8] The trial court found that "plaintiff was no longer a director" when the executive committee made its bonus distribution decisions. That finding was not supported by the evidence. Plaintiff remained a director of O&A until the fall of 1997, and so was a board member when the Executive Committee members paid themselves bonuses in 1996. Plaintiff had a right to be informed of Executive Committee decisions that required board approval, including the payment of bonuses.

*Baker*, the Supreme Court considered the remedies available for oppressive conduct. The court said that, "[d]epending upon the facts of the case and the nature of the problem involved, various alternative remedies may be appropriate," including:

> "The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders *at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price.*" 264 Or at 633 (emphasis added).

Following its decision in *Baker*, the Supreme Court has not had occasion to explain the meaning of the term "fair and reasonable price." However, in *Cooke*, also a case involving the oppression of minority shareholders, we found that the most persuasive evidence of a fair and reasonable price was an appraisal report valuing the plaintiff's stock based on a pro rata share of the corporation's going concern value. 169 Or App at 114. We have also held that neither a minority nor a marketability discount is appropriate in determining the fair value of the stock of a minority shareholder who is the victim of oppressive conduct. *Chiles*, 94 Or App at 643.

■     Although our task is to determine a fair and reasonable price for plaintiff's stock, that determination is inherently dependent on the nature and quality of the evidence presented by the parties. We review that evidence *de novo*, giving deference to any express or implied credibility determinations that the trial court made based on its observation of witnesses' demeanor during trial. *See, e.g., Brunswick v. Rundell*, 126 Or App 582, 586, 869 P2d 886 (1994); *see also State v. Rider*, 157 Or App 480, 970 P2d 258 (1998); *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 884 P2d 885 (1994). With those considerations in mind, we turn to the valuation evidence.

Plaintiff's expert witness, Michael Bathhurst, a CPA and certified evaluation expert with a law degree and experience in valuing closely held corporations, gave his opinion as to a fair price for plaintiff's stock. Bathhurst explained the distinction between the "fair value" and "fair market value" of closely held stock:

"Fair market value is essentially a phrase that comes out of Internal Revenue Service in terms of the state gift tax valuations. And to paraphrase it, it's the price that a willing seller,—a willing buyer would pay if they had no compulsion to do the deal, and they had all the relevant information.

"Fair value is something that has developed over time to deal with situations where there's corporate disputes, shareholder dissent. * * * *And it essentially comes to the same value as fair market value.* The difference there is that you back out one thing. [In] fair value you don't consider minority interest or marketability discounts." (Emphasis added.)

Bathhurst studied the history of O&A. He emphasized its unbroken practice, through 1997, of valuing its shares based on the rule-of-thumb formula in negotiations with other food brokerages, including Christy Damon, Performance Northwest, and the Advantage Group. Bathhurst explained that the rule-of-thumb formula is a reliable method for determining the fair value of O&A's stock, because it is based on arm's-length transactions involving O&A and other brokerages of comparable size. Applying that formula, Bathhurst determined that O&A's overall value as of December 1997[9] was $5,700,000, and that plaintiff's proportionate share of the corporation's value was $1,174,000, or $171.35 per share. Bathhurst also concluded that O&A was financially able to pay plaintiff that sum, on the terms provided in the settlement agreement, without risking insolvency. On cross-examination, Bathhurst acknowledged that he had never valued a food brokerage before. However, he testified that the method he used to value O&A's stock was generally accepted by business appraisers.

Defendants, on the other hand, offered no expert opinion evidence concerning O&A's value. Instead, they

---

[9] Presumably because it did not adopt a going concern value formula for plaintiff's shares, the trial court apparently did not consider a specific valuation date in setting the purchase price. Bathhurst's choice of the date of trial is appropriate under the circumstances.

relied exclusively on the testimony of members of the Executive Committee. Arbanas, Wynne, and Olmstead each testified that, in their experience, there is no industry rule-of-thumb formula that generally applies to transactions between food brokerages. Rather, the strategy on both sides is to achieve the most advantageous price, and the actual price per share simply depends on the market and the particular brokerage. Wynne testified that, assuming that a percentage of gross revenue could establish a benchmark for value, stock transactions involving food brokerages ranged in price from 25 percent to over 100 percent of annual gross revenue.

According to defendants, the SPA provides the most reliable value of plaintiff's shares, because (1) in setting the SPA value, the shareholders balanced their individual interests against the corporation's interest in establishing a price that would not unduly burden it financially; (2) when a shareholder leaves the corporation, the remaining shareholders benefit from continuity and the departing shareholder benefits from the availability of a buyer for otherwise unmarketable shares; (3) plaintiff participated in determining the $64 per share value in 1994 and elected not to participate in the September 1997 meeting at which the $67 per share value was set; (4) plaintiff benefitted from the corporation's failure to follow corporate formalities, because he also received bonuses not approved by the Board of Directors; and (5) the price of $171 per share would give a windfall to plaintiff and would create an unfair economic burden on O&A.

In its written opinion, the trial court discussed each of the parties' valuation theories and then explained how it reached a fair value of $67 per share:

> "The argument I find more credible toward reaching fair value is two fold. One, [Crites] left [O&A] the same time as [plaintiff] and was offered $64.00 per share. He had spoken earlier with [plaintiff] about his concern about bonus distributions and stock valuation. [Crites] brought in his own representative, a CPA, to the negotiations and settled upon $67.00 per share. Plaintiff argues this was not an arms length transaction, but other than pure speculation, plaintiff offers no hard evidence that [Crites] and his CPA, Mr. Grimaldi did not have all the financial information they

needed to satisfy themselves that they were receiving a fair price under the circumstances. The evidence is that this truly was an arms length transaction.

"Secondly, the SPA has a trigger cash out upon death or disability of a shareholder. It is only common sense and self-preservation that would drive all shareholders to attempt to set a price that would maximize a payout in case of disability, for example, but still leave the corporation viable.

"That price was $64.00 per share and has not been officially changed (although a shareholder resolution purports to move the value to $67.00 per share) since 1994. [Crites] received $67.00 per share at an arms length transaction and Mr. Simmons who left after [plaintiff] and [Crites] also received $67.00 pershare. It is this $67.00 per share the court finds to be the fair value."

The trial court implicitly rejected plaintiff's position that his stock should be valued as a pro rata share of the corporation's going concern value. For the following reasons, we conclude that the persuasive weight of the evidence does not support the trial court's findings.

First, although one of the witnesses mentioned in passing that O&A had redeemed Simmons's shares, Simmons was not a voting shareholder, and there was no evidence that the circumstances of that transaction were comparable to those presented here. In fact, there was no meaningful evidence concerning any of the factors that affected the Simmons's redemption. The trial court thus erred in giving that transaction any significant weight. Second, there was no evidence that Crites attempted to or, more to the point, succeeded, in selling his stock to O&A for an oppression-based price. Crites did not testify at trial, and the factors underlying his decision to sell his stock are also unclear. The Crites transaction likewise is entitled to little, if any, weight in this case, which involves a finding of oppression.

Third, the SPA price does not reflect the undiscounted fair value of plaintiff's stock. As O&A points out, the SPA reflects a contractual *balancing* of interests among the corporation and its shareholders, in which no party's interests are *maximized*. After 1994, the shareholders made no

effort to update the SPA price annually so that it would remain consistent with the rule-of-thumb value that O&A continued to use in its external transactions. In short, O&A's arguments necessarily concede, and we agree, that the SPA value does not reflect the fair value of the corporation in the context of shareholder oppression.

Fourth, we reject O&A's argument that "to give a shareholder a pro rata share of the total value of the Company sold as a going concern results in an artificially-and unduly burdensome-inflated price." It is clear from the case law that a "fair and reasonable price" in the context of minority shareholder oppression must be determined *in light of the oppression*. Our task is not accomplished, as O&A would have it, merely by "rounding out" plaintiff's compensation package under the settlement agreement.

Fifth, the best evidence of the fair value of plaintiff's stock came from Bathhurst. The corporation is a going concern, and, having established oppression, plaintiff is entitled to be compensated for the fair value of his stock, without regard to discounts applicable in other settings. O&A offered no independent expert opinion evidence as to the fair value of plaintiff's stock. In adopting that strategy, O&A essentially took an all or nothing approach. The value of plaintiff's shares was either the SPA price, as O&A urged, or a pro rata share of O&A's going concern value, as plaintiff asserted. Simply put, we are more persuaded by plaintiff's evidence, which is based on the valuation formula that O&A applied in its external dealings through the time of plaintiff's discharge. O&A's position that the rule-of-thumb formula was of diminished importance after 1994 was discredited by the undisputed evidence of the central role that it played in the Performance Northwest and Advantage Group negotiations. In disagreeing with the trial court's determination of the value of plaintiff's stock, we have considered its ability to assess the credibility of the witnesses. However, our points of disagreement have less to do with credibility issues than they do with our view of the proper application of essentially undisputed evidence to the legal principles that govern the valuation of an oppressed shareholder's stock. In reaching our conclusion, we have labored to pay proper respect to our role on *de novo* review.

Finally, we are not persuaded that the payment to plaintiff of $171.35 per share over the 10-year period provided in the settlement agreement will create an unfair burden on O&A. Wynne testified that, if O&A were required to compensate *each of its retiring shareholders* pursuant to the rule-of-thumb formula, the debt load would not be sustainable and the corporation would become insolvent. There was no credible evidence, however, that the payment of $1,174,000 *to plaintiff*, under the terms permitted by the settlement agreement, would impose such a burden. We conclude that on this record, that value is most accurately reflected in a price of $171.35 per share. Accordingly, we modify the judgment in plaintiff's favor to reflect a $171.35 per share value and price for his stock.

Remanded for entry of modified judgment for plaintiff reflecting a value and price of $171.35 per share for plaintiff's stock in O&A; otherwise affirmed.