Argued and submitted March 22, affirmed December 12, 2007

Scott DAVIS,
*Plaintiff-Appellant,*

*v.*

BROCKAMP & JAEGER, INC.,
an Oregon corporation
and Terry C. Greenman,
*Defendants-Respondents.*

Clackamas County Circuit Court
CV04030104; A129304

174 P3d 607

Gregory W. Byrne argued the cause and filed the briefs for appellant.

Robyn Ridler argued the cause for respondents. With her on the joint brief were Barbee B. Lyon and Tonkon Torp LLP, and Brian R. Talcott, Thomas H. Tongue, and Dunn Carney Allen Higgins & Tongue LLP.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Plaintiff appeals a judgment dismissing his claims for, among other things, diversion of a corporate opportunity and minority shareholder oppression by defendant Terry Greenman, the president, sole director, and majority shareholder of Brockamp & Jaeger, Inc. (BJI).[1] Plaintiff argues that the trial court erred in dismissing those claims and in failing to award plaintiff punitive damages. On *de novo* review, we affirm.

We take the following facts from the record developed at the trial of plaintiff's claims. BJI is a construction company founded by John Brockamp and Roy Jaeger, who were initially the sole shareholders. In 1985, defendant, who was a company employee, became a shareholder. At that time, each of the three shareholders owned 50 shares, and all three served as corporate directors. Brockamp retired in 1993 and sold his shares to BJI. On several occasions thereafter, Roy Jaeger gave some of his shares to his sons, Craig and Chris, and to plaintiff, who is Roy Jaeger's son-in-law; all three of the recipients were also employed by BJI as project managers. At the beginning of 1997, Craig Jaeger held four shares, and Chris Jaeger and plaintiff each held three. Around that time, Roy Jaeger retired and, as Brockamp had, sold his remaining shares to BJI. The retirement of Brockamp and Roy Jaeger left defendant as the majority shareholder of BJI. As the majority shareholder, he elected himself as the sole director and, in turn, appointed himself as president.

When Roy Jaeger retired, BJI sold seven shares apiece to plaintiff, Craig and Chris Jaeger, and Russ Tuttle, another project manager. Defendant testified at trial that the sale was intended to further two purposes: (1) to boost the company's equity, which was diminished by the redemption of Brockamp's and Roy Jaeger's shares; and (2) to have new shareholders in place so the company could continue operating and buy defendant's shares when he eventually retired.

---

[1] BJI is named as a defendant in this case. However, all of plaintiff's claims are based on Greenman's alleged conduct. For simplicity, we refer only to Greenman as "defendant." References to "defendants" refer to both Greenman and BJI.

The new stock was issued on March 1, 1997, at a price of $14,800 per share, payable in seven annual installments plus interest, with the first payment due in January 1998. Each shareholder was given the option of deferring any annual payment for a period of up to one year without penalty. In conjunction with the purchase, each shareholder signed an agreement that required, among other things, each shareholder to sell his shares to the company upon termination of employment. The agreement provided that the company would purchase the shares at their "adjusted book value" or, if the shareholder terminated his employment without the express approval of the board of directors, the lesser of the adjusted book value or the amount paid for the shares plus interest from the date of payment.

Plaintiff's arguments on appeal center on three somewhat distinct groups of facts related to shareholder bonuses, the minority shareholders' involvement in the management of BJI, and an alleged diversion of a corporate opportunity. Although the timing of many of the events overlaps, we recite each group of facts separately in order to frame the issues that plaintiff raises in this appeal. The claims to which some of the facts pertain also overlap; whereas the facts related to shareholder bonuses and management of BJI pertain only to plaintiff's minority shareholder oppression claim, the facts related to corporate opportunity pertain to both the diversion claim and the oppression claim.

## SHAREHOLDER BONUSES

Plaintiff's minority shareholder oppression claim centers in large part on his allegation that defendant paid bonuses to himself that were disproportionately high and paid bonuses to the minority shareholders that were disproportionately low relative to their respective shares in the company. The history of how bonuses were calculated is pertinent to the parties' arguments on appeal, so we recite that history in some detail.

Given that all of its shareholders were also employees, BJI distributed its profits as annual bonuses, rather than dividends, in order to reduce the company's tax liability. The minutes of the annual board meetings show that, from

1987 through 1990, Brockamp, Jaeger, and defendant received equal bonuses.[2] However, the minutes for the 1991 board meeting state that, "[b]ased on the respective contributions made to the Company's performance during the year," Brockamp's bonus was $49,000, Jaeger's was $194,000, and defendant's was $176,000. Defendant testified that the disparity in the bonuses "had to do with the projects they brought in," meaning the various construction jobs that each had secured for the company.

In 1992, the board decided not to pay any bonuses because the company needed to increase its equity in order to secure the bonding that it needed for some jobs. In 1993, the board again paid bonuses: Brockamp received $125,000, and Jaeger and defendant each received $250,000, again, according to the minutes of the board meeting, based on the "respective contributions made to the Company's performance * * *." Defendant explained at trial that Brockamp was contemplating retirement and working only half time, so his bonus was only half that of the other two shareholders. From 1994 to 1996, the three years that Jaeger remained with the company after Brockamp retired, he and defendant received equal bonuses. The minutes for each of those years again indicate that "relative contribution" was a factor in determining the bonuses.

Before plaintiff and the other three employees agreed to purchase their shares in 1997, BJI's accountant, John Thompson, discussed the company's bonus plan with them. He gave them a copy of a document entitled "Example of Potential 1997 Bonus Computations." According to that document, bonuses would be the sum of two separately calculated amounts: (1) a return on the equity that each shareholder had in the company[3] and (2) the amount needed by each minority shareholder to cover the annual payment on the stock purchase. Defendant testified that the rate of

---

[2] 1987 is the first year for which board meeting minutes are in the record.

[3] The minority shareholders' equity was calculated according to the number of shares that Roy Jaeger had given to them and the number of new shares that each had actually paid for. Thus, at the end of 1997, when none of the minority shareholders had yet made the first payment, their equity was based solely on the shares the Jaeger had given them. Consequently, Tuttle was deemed to have no equity in the company.

return on equity was "probably tied to what the market was doing at the time." Thompson's example showed that, for BJI to retain enough earnings to increase the company's equity by $200,000, and to pay each shareholder a 15 percent return on his equity in the company as well as the amount that each minority shareholder needed to make his payment on the stock purchase, with an equalizing payment to defendant,[4] BJI would need to earn $853,000. According to Thompson's document, if BJI earned that amount, plaintiff's bonus would be $43,500, and defendant's would be $363,000, approximately 8.3 times the amount of plaintiff's bonus.

At the end of 1997, defendant calculated bonuses using the same factors that Thompson had used in the example computation. BJI's profits were somewhat lower than the amount shown in Thompson's example, so the bonuses were also lower. Plaintiff's bonus was $37,200; defendant's was $233,000—6.3 times the amount of plaintiff's. Defendant had a meeting with the minority shareholders at which he explained to them how he had calculated the bonuses.

In 1998, defendant terminated Thompson's services and hired a new accountant, Glen Lovett. After consulting with Lovett, defendant added another factor to the formula for calculating bonuses. A company document showing the bonuses and how they were calculated that year describes the factor as "discretionary based on revenue contribution and effort." According to defendant, it represented "a calculation of how much each person contributed to the gross profits of the company." Defendant testified that he decided to include that factor in calculating bonuses in 1998 and thereafter in order to give the minority shareholders "more incentive to do better." All of the shareholders served as project managers for BJI, so, to calculate their contribution, defendant totaled the profits from all of the projects that each shareholder had managed that year. According to a document showing how defendant calculated the bonuses for 1998, his projects accounted for 36 percent of BJI's profits;

---

[4] Thompson determined that each minority shareholder would need a pretax bonus of $30,000 in order to make the $19,092 payment (including interest) on the stock purchase, and that defendant would receive an additional $153,000 so that his bonus would be in proportion to his share of ownership in the company.

plaintiff's projects accounted for 22 percent; and Tuttle's, Craig Jaeger's, and Chris Jaeger's accounted for 19 percent, 18 percent, and five percent, respectively.[5] The document also indicates that, after BJI's expenses were paid and $150,000 was retained for equity growth, $486,504 was available for shareholder bonuses. Defendant subtracted from that amount a 12 percent return on each shareholder's equity, $12,957 for each minority shareholder as the "bonus for stock purchase," and $68,172 for defendant's "equalizing" bonus. Defendant divided the remaining $105,041 according to the "contribution" percentages that he had calculated. Plaintiff's bonus that year was $52,044; defendant's was $314,756—six times the amount of plaintiff's bonus. Defendant again held a meeting with the minority shareholders to explain how the bonuses were calculated.

In 1999, when defendant determined the shareholder bonuses, he eliminated the "bonus for stock purchase" factor. He also concluded that BJI did not need to increase its equity, so no earnings were retained. Thus, after determining the amount of each shareholder's return on equity, he divided the remaining bonus pool according to the percentage of BJI's profits that were attributable to each shareholder's project management. Defendant determined that his projects accounted for 58 percent of BJI's profits and plaintiff's and Tuttle's projects accounted for 21 percent each. Craig Jaeger had resigned from the company and redeemed his shares, and, according to defendant, Chris Jaeger "didn't have any jobs that year," so neither of the Jaeger brothers was credited with any of BJI's profits. Plaintiff's bonus in 1999 was $106,000; defendant's was $805,000—7.6 times the amount of plaintiff's bonus. Although Chris Jaeger had not contributed any profits to BJI in 1999, he received a bonus of $15,000 as a return on his equity in the company.

---

[5] According to a handwritten worksheet on which defendant had calculated each shareholder's contribution to BJI's profits, Tuttle's projects actually accounted for only seven percent of profits and Chris Jaeger's for only two percent. However, it appears that defendant adjusted his own, plaintiff's, and Craig Jaeger's percentages downward by five percent in order to boost Tuttle's and Chris Jaeger's numbers to 19 and five percent, respectively. Defendant testified that he did so with respect to Tuttle because Tuttle had put a lot of effort into jobs that would be finished the next year, thus indicating that Tuttle's profit numbers were artificially low. He did not explain why he boosted Chris Jaeger's percentage.

In 2000, both Chris Jaeger and Tuttle left BJI and redeemed their shares, leaving plaintiff and defendant as the only shareholders. That year, defendant followed the same formula he had in 1999. After calculating the return on equity, defendant determined that he was responsible for 80 percent of BJI's profits and that plaintiff was responsible for 20 percent, and he divided the remaining bonus pool accordingly. Plaintiff's bonus was $131,325; defendant's was $934,267—7.1 times the amount of plaintiff's bonus.

In 2001, BJI experienced a significant downturn in business. At the end of the year, the bonus pool consisted of only $325,000. Defendant concluded that, given the small size of the bonus pool, he would not go to the trouble of calculating his and plaintiff's respective shares of the company's equity or the percentage of profits attributable to their respective projects. Instead, he merely divided the bonus pool according to the number of shares that each held. Thus, plaintiff received 17 percent of the bonus pool—$55,250— and defendant received 83 percent—$269,750, approximately 4.9 times the amount of plaintiff's bonus.[6]

In 2002, BJI's profits recovered somewhat. At the end of the year, defendant again determined each shareholder's equity and contribution to profits. Plaintiff had managed fewer projects that year than he had previously, and, in determining plaintiff's contribution to profits, defendant discovered that plaintiff's projects had produced only five percent of the company's profits that year. On the worksheet on which defendant calculated their respective contributions, he wrote that plaintiff "didn't even generate his wages," and indicated that plaintiff would receive a "ret[urn] on equity only." Plaintiff's bonus was $20,000. Defendant received the rest of the bonus pool—$525,000, which was 26.3 times the amount of plaintiff's bonus.

Plaintiff began looking for a new job shortly after receiving his bonus check. On May 5, 2003, he tendered his resignation.

---

[6] In fact, defendant rounded the percentages in plaintiff's favor: plaintiff's 10 shares amounted to 16.7 percent of the outstanding shares, and defendant's 50 shares amounted to 83.3 percent.

## MINORITY SHAREHOLDERS' INVOLVEMENT IN MANAGEMENT

The evidence in the record concerning the minority shareholders' involvement in the management of BJI consists primarily of trial testimony. Several witnesses testified regarding defendant's management of BJI and the minority shareholders' role in management, as well as the relationships among the shareholders. Roy Jaeger testified that, before he retired, BJI held weekly management meetings "very religiously every Monday morning" to discuss how the company's jobs were progressing, whether expenditures were in line with cost estimates, how employees should be allocated among the various jobs, and other business matters. He also testified that, before he and Brockamp retired, the three owners always consulted with each other before making any major decisions.

Defendant testified that, after Jaeger retired, weekly management meetings continued for a time, but he eventually stopped holding them regularly. He explained that the office was small and that he and most of the employees saw each other every day, so it was possible to conduct business less formally "in the hall." He also stated that, after 1998, he stopped holding annual shareholder meetings because there was significant dissension among the minority shareholders and they often could not arrive at any conclusions. According to defendant, plaintiff and the Jaeger brothers "didn't get along very well."

Plaintiff also testified that weekly management meetings stopped occurring regularly a few months after Roy Jaeger retired. Plaintiff's testimony echoed what defendant said about dissension among the shareholders, although, in his view, defendant was also part of the problem. He stated that "there was a lot of animosity between [defendant] and Russ Tuttle and Craig Jaeger, and the meetings just weren't really productive anymore because nobody, you know—they couldn't agree with [defendant]. And so [defendant] just canceled them or he wouldn't show up and we would arbitrarily cancel."

Tuttle also testified. He stated that the minority shareholders were dissatisfied with the level of control they

had over the company and that "the majority" of the minority shareholders felt that they did not have a voice in the company. Tuttle disagreed with the other minority shareholders' assessment, stating that, although defendant "had all the say" as the majority shareholder, "I never did feel that we didn't have a voice * * *." He explained that, although BJI did not have formal shareholder meetings, "there wasn't a time when I couldn't walk right into [defendant's] office and talk to him, which I did on occasion." He stated that defendant may not always have liked what he had to say, but that defendant always kept an "open door." Tuttle also stated that he believed that defendant had treated both him and plaintiff fairly as shareholders.

## CORPORATE OPPORTUNITY

In 1996, defendant was approached by Todd DeNeffe, a realtor who represented a manufacturing company known as Michaels of Oregon.[7] DeNeffe told defendant that the company was looking for a property developer to buy a parcel of land known as "Red Soils lot 7" and build a manufacturing facility to lease to Michaels. DeNeffe wanted to know if BJI was interested in undertaking the venture.

Defendant was not interested in committing BJI to owning and leasing the property, but he believed that, if he found a developer for Michaels, he could secure the construction job for BJI. Defendant asked his brother, Ronald Greenman, who serves as BJI's corporate attorney, if he knew anyone who would be interested in pursuing the project. Greenman introduced defendant to Robert Smith, who is Greenman's partner in a real estate investment company called Wy'East Properties. Smith, the major partner in the investment company, agreed to undertake the development venture. He decided that Wy'East Properties would create a new business entity, RS #7 LLC, to own the land and building and to enter into the lease with Michaels.

Defendant and Smith agreed that defendant would take responsibility for moving the project forward in terms of

---

[7] DeNeffe initially approached John Brockamp, whom DeNeffe described as a family friend. Brockamp told him that he had retired from BJI and that DeNeffe should contact defendant.

dealing with the property seller and securing necessary permits. While Smith was pursuing financing arrangements, Greenman advised defendant that BJI could "tie up" the property by entering into an earnest money agreement with the property owner. On March 10, 1997, defendant, on behalf of BJI, signed a "term sheet" that committed BJI to purchasing the parcel but that also allowed BJI to assign the right to purchase it.[8] Defendant testified that he never intended for BJI to actually buy the property.

At some point after Smith agreed to undertake the venture, he invited defendant to invest in RS #7 LLC. Defendant accepted the invitation. According to the operating agreement for RS #7 LLC, which was legally organized on April 21, 1997, defendant made a capital contribution of $100,000.[9] Smith testified that he had made similar offers to other individuals with whom he had worked on previous development projects. He stated that he never co-invested with corporations, so he did not consider offering BJI an opportunity to invest in RS #7 LLC.

Defendant, acting on behalf of BJI, assigned to RS #7 LLC the right to buy the parcel of land. On June 4, 1997, the sale closed. BJI constructed the building, for which it received a contractor's fee of $100,000.[10]

Defendant did not consult with the minority shareholders about whether BJI should undertake the Michaels venture. He also did not inform the minority shareholders that he had an interest in RS #7 LLC before he assigned the right to buy the property to that company. Defendant testified that BJI had a policy of not owning or developing property; he stated that the policy had been in place when he began working for the company. He also testified that he believed that developing the property would have tied up too

[8] BJI paid $25,000 in earnest money pursuant to the agreement. That money was refunded to BJI when the sale closed.

[9] Defendant made his capital contribution using part of the proceeds of a $125,000 loan that he took out from BJI. He did not seek authorization from the minority shareholders before taking the loan.

[10] Due to cost overruns, BJI actually earned a profit of $84,875.

much of BJI's liquid assets for it to be able to obtain the bonding that was required for some of its other projects. Defendant stated that, in his view, the venture was not an opportunity for BJI and that he saw it simply as an opportunity to construct a building.

Plaintiff initiated this action in March 2004, initially alleging only minority shareholder oppression based on bonuses and management issues. In the course of preparing for trial, plaintiff learned, among other things, that DeNeffe had approached defendant as BJI's president with the Michaels proposal and that BJI had entered into the earnest money agreement with the seller of Red Soils lot 7 but assigned the right to buy the property to RS #7 LLC. Plaintiff successfully moved to amend his complaint based on the newly discovered information. In the amended complaint, plaintiff augmented his claim for minority shareholder oppression by adding allegations that defendant breached his fiduciary duties by diverting corporate opportunities and borrowing money from BJI without disclosure or authorization. He also added derivative claims for diversion of corporate opportunity, corporate waste, and intentional interference with contract, as well as a claim for punitive damages.

Plaintiff's claims were tried to the court. After the trial concluded, the court found for defendants on all claims. This appeal followed.

Plaintiff advances three assignments of error in which he reiterates his claims for diversion of a corporate opportunity, minority shareholder oppression, and punitive damages.[11] We begin by addressing the second assignment of error, concerning the claim for minority shareholder oppression. For reasons that will become obvious, our conclusion with respect to that assignment disposes of the first and third assignments as well.

■ "Minority shareholder oppression" is not defined by statute, and the case law indicates that the concept is rather

---

[11] Plaintiff does not assign error to the trial court's rulings in defendants' favor on plaintiff's claims for intentional interference with contract and waste of corporate assets. Accordingly, we do not consider those claims on appeal.

nebulous, such that a definitive definition may not be possible. *See, e.g.*, *Cooke v. Fresh Express Foods Corp.*, 169 Or App 101, 110, 7 P3d 717 (2000) ("[A]ttempts to define what oppressive conduct is, instead of what it is not, have proved elusive, and cases of this sort depend heavily on their specific facts."); *Weiner Investment Co. v. Weiner*, 105 Or App 339, 343, 804 P2d 1211 (1991) ("The nebulousness of the oppressive conduct concept, in which fairness plays a prominent role, necessarily makes oppressive conduct cases fact dependent."). However, certain guiding principles are well established. In *Baker v. Commercial Body Builders*, 264 Or 614, 628-29, 507 P2d 387 (1973), the Supreme Court described oppressive conduct as

> "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual [*sic*] departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely."

(Internal quotation marks omitted.) In closely held corporations, a breach of fiduciary duty by majority shareholders normally constitutes oppression. *Hayes v. Olmsted & Associates, Inc.*, 173 Or App 259, 265, 21 P3d 178, *rev den*, 333 Or 73 (2001); *see also Zidell v. Zidell, Inc. (24128)*, 277 Or 413, 418, 560 P2d 1086 (1977) (those in control of the affairs of a closely held corporation have fiduciary duties of good faith and fair dealing toward minority shareholders).

> "[I]n *Cooke*, we emphasized that the court must defer to the business decisions made by the majority shareholders of a close corporation, as long as they are genuine. 169 Or App at 110. Moreover, the existence of one or more badges of oppression in isolation does not necessarily justify relief. *Id.* Instead, we examine the pattern of conduct of those in control and the effect of that conduct on the minority to determine whether, in sum, they show oppression. *Id.* at 108-10."

*Hayes*, 173 Or App at 266. With those principles in mind, we turn to the parties' arguments.

Plaintiff first contends that defendant did not pay him a fair share of the company's profits when awarding bonuses. He also argues that defendant excluded him from

any meaningful role in the management of BJI by denying him corporate information and by failing to consult with him before making management decisions. Finally, plaintiff argues that defendant oppressed the minority shareholders by diverting the Michaels of Oregon opportunity, which he describes as the "most conspicuous lack of information and participation."[12]

We begin with plaintiff's argument that defendant oppressed the minority shareholders by giving himself excessive bonuses while paying the other shareholders disproportionately low bonuses. The record shows that, before plaintiff became a shareholder, BJI had a practice of considering the relative contributions that each shareholder made to the company's profits. For example, in the two years before Brockamp retired, he worked only half time, so, although he remained an equal shareholder, his bonus was only half that of Jaeger and defendant. Defendant testified that, although he did not consider each shareholder's respective contribution in 1997, he decided to resume that practice in 1998 in order to create an incentive for the minority shareholders to increase their productivity. Lovett, BJI's accountant, also testified that that was the reason for adding the "contribution and effort" factor to the bonus calculations.

Our analysis is guided by *Zidell*, 277 Or at 418. That case involved four closely held corporations, all of which were owned by the same shareholders, including the plaintiff, who was a minority shareholder. Initially, all of the shareholders were also employed by the corporations, so, as in this case, the corporations compensated the shareholders through salaries and bonuses rather than by declaring dividends. The plaintiff eventually terminated his employment, but he remained a shareholder and demanded that the corporations begin declaring dividends. Each corporation thereafter declared dividends that the Supreme Court described as "modest when viewed as a rate of return on his investment." *Id.* at 421. At about the same time as the dividends were

---

[12] To the extent that plaintiff argues that defendant's $125,000 loan from BJI was a form of minority shareholder oppression, that argument is not sufficiently developed on appeal, and we decline to consider it.

declared, corporate salaries and bonuses were increased substantially. The plaintiff brought an action seeking an order compelling the declaration of larger dividends.

The Supreme Court stated that, insofar as a dividend policy is concerned, a majority shareholder's fiduciary duties of good faith and fair dealing are discharged if the majority's decisions are "made in good faith and reflect[ ] legitimate business purposes rather than the private interests of those in control." *Id.* at 418. The court stated that some factors that are commonly present in cases of oppression were also present in that case. Specifically, the court noted that the corporation could afford to pay additional dividends, that the plaintiff had left the corporate payroll, that the stockholders who remained employed received generous salaries and bonuses, and that there was hostility among the shareholders. The court observed that those factors are not, however, "invariably signs of improper behavior by the majority." *Id.* at 420. It also noted that the defendants had introduced credible evidence to justify the dividend policy. The court held that, although the dividends that the plaintiff had received were modest, they were reasonable in light of the corporation's financial needs.

■ Applying the principles enunciated in *Zidell*, we conclude that the bonuses that defendant paid reflected a legitimate business purpose—namely, creating incentive for the shareholders to increase BJI's profitability. There is little evidence to substantiate plaintiff's assertion that defendant's bonus decisions were motivated by greed, and at least some evidence that belies that assertion.

Plaintiff contends that defendant's claim that bonuses were tied to job performance is a sham and that defendant's "contribution and effort" analysis was a subterfuge for keeping the lion's share of the profits for himself. He asserts that, starting in 1998, defendant began awarding bonuses "based solely on his own subjective determination of each shareholder's 'contribution and effort,' " and that defendant "arbitrarily" decided that he had contributed more to BJI than plaintiff had.

Plaintiff's assertion is incorrect in two respects. First, defendant never determined bonuses *solely* on the basis of contribution and effort. In fact, except in 2002, it was not even the primary factor: From 1998 to 2000, the major portion of the bonuses was allocated as "return on equity"; defendant allocated only approximately one-fourth of each bonus pool on the basis of contribution and effort. And in 2001, he did not consider contribution and effort at all.

Second, defendant's determination of each shareholder's contribution and effort was not entirely subjective or arbitrary. Defendant based his determinations primarily on an objective measure: the profits generated by the construction projects that each shareholder had managed. It is true that defendant made some adjustments to the objective figures on a subjective basis. However, those adjustments accounted for only a small fraction of the total bonuses. Furthermore, in at least one year, defendant's subjective adjustments included a downward adjustment to his own "contribution and effort" figure, which he made in order to boost the bonuses for Tuttle and Chris Jaeger. That fact belies plaintiff's assertion that defendant's bonus determinations were motivated by greed.

Plaintiff contends further that, even if defendant made an ostensible effort to evaluate each shareholder's productivity, he "put his thumb on the scale" by taking credit for plaintiff's projects, by assigning the most productive superintendents to his own projects, and by reducing the amount of time that plaintiff could spend on his construction projects by making him responsible for BJI's marketing program.

In support of his assertion that defendant took credit for his projects, plaintiff points to one instance in which defendant took half of the credit for a project that plaintiff had managed. That project was part of a series of large projects that BJI constructed for a single client that defendant had developed over a number of years. Except for the project that plaintiff managed, defendant was the project manager for the whole series. Defendant testified that he believed that

he was entitled to half of the credit for the project that plaintiff managed because, but for his efforts in developing the client, BJI would not have had the project at all. Plaintiff cites no other evidence, and we have found none, that defendant took credit for plaintiff's projects.[13]

On the other hand, the record indicates that defendant shared credit equally with plaintiff for projects that the other minority shareholders had been managing before they left BJI. Defendant testified that, after Tuttle left the company, plaintiff suggested splitting the credit for his projects on the basis of stock ownership but that, given that neither of them had been involved in the projects, he decided to split the credit evenly.

With respect to BJI's marketing program, plaintiff himself testified that the program was his idea and that defendant told him that, if he "wanted to go out and find clients * * *, that was fine." Furthermore, defendant testified that, in his view, plaintiff should have been able to manage construction projects while he was working on the marketing program. That testimony contradicts plaintiff's assertion that defendant intentionally reduced the amount of time that he could spend on construction projects.

The evidence that plaintiff relies on could be seen as an indication of impropriety by defendant. However, plaintiff bore the burden of proving his claim by a preponderance of the evidence. Viewing the record as a whole, we conclude that plaintiff failed to meet his burden to show that defendant's bonus determinations were intentionally self-serving.

■ Plaintiff contends that our previous cases indicate that the law is concerned not with intentional wrongdoing by the majority but with insufficient benefit to the minority. We disagree that the cases that plaintiff relies on stand for that proposition,[14] but, even if they did, plaintiff's assertion of

---

[13] The only other evidence suggesting that defendant took credit for any other projects that were not his is plaintiff's testimony, in which he stated, "I would say in more cases than not, [defendant] was just taking the credit [rather than actually managing the projects]." Plaintiff's testimony is also the only evidence that defendant assigned the most productive staff to his own projects. He adduced no other evidence to substantiate those assertions.

[14] Plaintiff states that *Naito v. Naito*, 178 Or App 1, 24, 35 P3d 1068 (2001), "requires a good faith effort to provide 'a reasonable portion of the corporation's

"insufficient benefit" is not well taken. Even in 2002, when he received no bonus for contribution and effort, he still received a return on equity of approximately 12.5 percent. Although that return may have been modest in comparison to other years, we decline to hold that it was insufficient. *Cf. Zidell*, 277 Or at 421 (holding that dividends paid were reasonable even though they were "modest when viewed as a rate of return on [the plaintiff's] investment").

In short, we conclude that defendant's bonus determinations were not oppressive.

We turn to plaintiff's arguments that defendant excluded him from any meaningful role in the management of BJI. First, plaintiff contends that he was denied corporate information—specifically, BJI's financial statements. Plaintiff asserts that he had to beg the office manager, Helen Beseda, for financial statements and that she allowed him to look at them only if he promised not to tell defendant.

Denial of access to financial statements could constitute a breach of the fiduciary duty of full disclosure. There was conflicting testimony with respect to plaintiff's access to BJI's financial statements. Plaintiff testified that he had to

___

income to the shareholders,' " and *Chiles v. Robertson*, 94 Or App 604, 623, 767 P2d 903, *adh'd to as modified on recons*, 96 Or App 658, 774 P2d 500, *rev den*, 308 Or 592 (1989), "requires the majority to use its power to control the corporation to ' "benefit all shareholders proportionately." ' " Plaintiff does not read our statements in those cases in context.

In *Naito*, we stated that a share repurchase offer

"did not constitute a good faith effort on the part of the board to provide a reasonable portion of the corporation's income to the shareholders, nor does it justify the failure to pay adequate dividends. By failing to provide for adequate dividends or other financial benefits on reasonable terms, [the controlling shareholder] acted for his own self-interest in derogation of the interests of the minority shareholders * * *."

178 Or App at 24.

The statement that plaintiff quotes from *Chiles* came from a California case that observed that

" '[m]ajority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. *Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately * * *.' "*

*Chiles*, 94 Or App at 622-23 (quoting *Jones v. H. F. Ahmanson & Co.*, 1 Cal 3d 93, 460 P2d 464, 81 Cal Rptr 592 (1969) (emphasis in *Chiles*)). Those opinions do not disregard the self-serving aspect of the majority's conduct.

beg Beseda for them and that he had to promise not to tell defendant that she gave them to him. On the other hand, both defendant and Beseda testified that defendant never instructed her to withhold financial statements from any of the minority shareholders. Beseda also testified that she recalled giving plaintiff a copy and telling defendant that she had done so. We find that plaintiff was not denied access to BJI's financial statements, and we conclude, therefore, that there was no oppression on that ground.

Second, plaintiff contends that defendant did not consult with the minority shareholders before making management decisions. In support of that contention, plaintiff asserts that, when Brockamp and Roy Jaeger were shareholders, decisions were made by consensus whereas, after they retired, defendant did not consult with the minority shareholders. Plaintiff cites a number of decisions that defendant made without consulting plaintiff, such as replacing BJI's accountant and settling disputes with the Jaeger brothers over the redemption of their stock.

■■ The record indicates that, with respect to many decisions, defendant merely informed the minority shareholders after having made the decisions. Nevertheless, we conclude that defendant's actions were not oppressive. Plaintiff underestimates the significance of defendant's majority shareholder status. As the majority shareholder, defendant was entitled to decide who BJI's accountant should be and to resolve issues such as the Jaeger brothers' stock redemption disputes. *See Naito v. Naito*, 178 Or App 1, 21, 35 P3d 1068 (2001) (holding that the diminution of the plaintiffs' involvement in and influence over corporate policy was the result of having shifted from being 50 percent shareholders to a minority position and that the defendants, having become the majority, acted within their rights in making decisions). Unless a corporation's articles of incorporation or bylaws (or some other agreement) specifically give minority shareholders the right to participate in such decisions—which they did not in this case—that right does not exist. *Cf. Hayes*, 173 Or App at 272 (holding that the defendants acted oppressively by creating a decision-making "executive committee" that did

not include all of the shareholders, in violation of the corporation's bylaws). We conclude that defendant's management of BJI was not oppressive.

Finally, we consider plaintiff's arguments concerning the Michaels venture in the context of his oppression claim. Diversion of a corporate opportunity is a breach of fiduciary duty. *Klinicki v. Lundgren*, 298 Or 662, 666, 695 P2d 906 (1985). When a corporate opportunity is usurped by the majority shareholder of a closely held corporation, that breach may constitute minority shareholder oppression. *See Hayes*, 173 Or App at 265 ("A breach of fiduciary duty by those who control a closely held corporation normally constitutes oppression.").

Plaintiff argues that defendant usurped the Michaels opportunity by diverting it to a company in which he had a financial interest. He contends that defendant was required to disclose all material facts concerning the Michaels transaction to the minority shareholders and to put the matter to a vote. In response, defendant points out that Smith's invitation to invest in RS #7 LLC came after defendant had rejected the Michaels opportunity on BJI's behalf.[15]

We reject plaintiff's contention that defendant was required to seek a vote of the minority shareholders. Plaintiff relies on *Klinicki*, in which the Supreme Court held that, if a director or senior executive officer of a closely held corporation wishes to take personal advantage of a corporate opportunity, the director or officer must promptly offer the opportunity and disclose all material facts regarding the opportunity to the disinterested directors or, if there are none, to the disinterested shareholders. 298 Or at 681-82.

Defendant's conduct here did not run afoul of *Klinicki* because defendant did not intend to take personal advantage

---

[15] The parties disagree as to whether the Michaels venture was ever a corporate opportunity for BJI. We conclude that it was, given that, when DeNeffe proposed the Michaels development venture, he brought it to defendant in his capacity as the president of BJI. *See Klinicki*, 298 Or at 678-79 (quoting American Law Institute, Principles of Corporate Governance: Analysis and Recommendations, Tentative Draft # 3, § 5.12) (any opportunity to engage in a business activity that is communicated to a director or senior executive officer in connection with the performance of his obligations as a principal senior executive or director is a corporate opportunity).

of the Michaels development opportunity when he rejected the opportunity on behalf of BJI. Defendant rejected the opportunity at the outset—that is, when, or shortly after, DeNeffe explained that he was looking for someone to develop the property, including building *and leasing the property* to Michaels—on the ground that BJI was not in the property development business. At that point, defendant had no financial interest in RS #7 LLC—indeed, defendant had not yet met Smith and RS #7 LLC had not even been conceived of—and there is no evidence that defendant otherwise intended to take personal advantage of the development opportunity. Accordingly, he was disinterested and, as the sole director of BJI, was entitled to reject the opportunity without involving the minority shareholders. *See id.* at 682 (a corporate opportunity is properly rejected if it is rejected by a majority of the disinterested directors).[16] His rejection did not constitute a usurpation of the opportunity.

Plaintiff disputes that defendant was disinterested when he rejected the opportunity on BJI's behalf. In his view, defendant intended from the outset to have a financial interest in the development project. He asserts that defendant rejected the Michaels opportunity on BJI's behalf because, had he done otherwise, he would have had to share any profit with the minority shareholders. But plaintiff does not explain why, if defendant's decision on BJI's behalf was motivated by self-interest, he diverted a potentially profitable opportunity away from a closely held company in which he had a 57 percent interest to one in which he had only a 22 percent interest.[17] The facts in the record simply do not comport with plaintiff's position.

---

[16] *Klinicki* does not address the precise situation that is before us in this case—namely, where a director or senior executive officer claims to have had no personal interest when he or she rejected an opportunity on behalf of the corporation and only later developed a personal interest in pursuing the opportunity. Ordinarily, it is exceedingly difficult to verify such a claim. We express no opinion as to whether an alleged usurper's assertion of initial disinterest would, without more, be enough to prove a proper corporate rejection. Here, defendant's assertion that he had no personal interest when he rejected the Michaels opportunity for BJI is supported by Smith's testimony that he offered defendant the opportunity to invest in RS #7 LLC after BJI had rejected the Michaels development opportunity and, even more persuasively, by the fact, as explained below, that defendant ended up holding a lesser interest in the Michaels venture than he would have had BJI undertaken it.

[17] The operating agreement for RS #7 LLC indicates that, as of June 1, 1997, Wy'East Properties had invested $350,000 in the LLC, and defendant had invested $100,000.

Plaintiff also asserts that the development opportunity remained available to BJI (or arose again) when BJI entered into the earnest money agreement that gave it the right to buy the parcel of land. As plaintiff points out, when BJI assigned the right to buy the parcel to RS #7 LLC, defendant had an ownership interest in both companies and thus had a conflict of interest.

■ It is true that defendant had a conflict of interest when he assigned the right to buy the parcel. However, under these circumstances, that conflict does not equate with diversion of a corporate opportunity and certainly not with minority shareholder oppression. When BJI acquired the right to buy the parcel, Smith had already agreed to undertake the development venture. It was understood from the beginning that BJI's role in the venture was limited to that of general contractor. Defendant's intent in entering into the earnest money agreement was simply to secure the property as a way of ensuring that the venture would not fall through—in fact, he was securing BJI's interest in performing the construction job. BJI's acquisition of the right to buy the parcel was never intended to renew its opportunity to pursue the Michaels venture as the developer. As far as BJI was concerned, there was no longer any corporate opportunity, aside from the opportunity to win the construction contract. Consequently, the assignment of that right to RS #7 LLC did not constitute a diversion of a corporate opportunity.

The question remains whether defendant nonetheless engaged in oppression by virtue of his interest in both companies at the time he assigned the right to buy the parcel of land to RS #7 LLC. We conclude that defendant did not oppress the minority shareholders because the assignment was not unfair to BJI, given the context in which it occurred. The assignment was consistent with the plan—and the agreed-upon role of BJI—that was in place from the time that Smith agreed to undertake the development venture—well before the conflict of interest arose. In other words, the decision to assign the right to buy the parcel to RS #7 LLC was not influenced by defendant's investment in the LLC. The events unfolded no differently than they would have had defendant not made that investment.

Our conclusion that the assignment was not unfair to BJI is bolstered by the fact that, when defendant, acting for BJI, entered into the earnest money agreement, he did so to further BJI's interests by helping to secure the construction job. When defendant later assigned the right to buy the parcel to RS #7 LLC, he was simply following through with that intent.

■ In short, defendant did not oppress the minority shareholders by rejecting the Michaels opportunity or by assigning the right to buy the parcel of land to RS #7 LLC.[18]

We conclude that none of the grounds advanced by plaintiff constituted minority shareholder oppression. We certainly find no "pattern of conduct" by defendant indicating shareholder oppression. *See Hayes*, 173 Or App at 266. Consequently, we reject plaintiff's second assignment of error.

Our disposition of that assignment also obviates the need to consider at length the first and third assignments of error. As noted, in the first, plaintiff argues that the trial court erred in dismissing his claim for diversion of corporate opportunity. That assignment of error fails for the reasons stated above with respect to plaintiff's oppression claim. In the third assignment of error, plaintiff contends that the trial court should have awarded punitive damages. Given that defendant prevailed on the merits of plaintiff's claims, that assignment of error must fail as well.

Affirmed.

---

[18] To the extent that plaintiff can be understood to argue that defendant diverted a corporate opportunity to invest in RS #7 LLC, we reject that contention. Smith testified that he made the investment offer to defendant in his individual capacity only; he made clear that he had no intention of extending the offer to BJI or its other shareholders.