182 P.3d 866 (2008)
219 Or. App. 207
In the Matter of A.V., a Minor Child.
STATE ex rel. JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, Respondent,
v.
L.V., Appellant.
2006807581, A136556.
Court of Appeals of Oregon.
Argued and Submitted January 15, 2008.
Decided April 9, 2008.
*867 James A. Palmer, Eugene, argued the cause and filed the brief for appellant.
Richard Wasserman waived appearance for respondent Juvenile Department of Multnomah County.
Julie G. Sutton filed the brief for respondent A.V.
Before ARMSTRONG, Presiding Judge, and ROSENBLUM, Judge, and CARSON, Senior Judge.
ROSENBLUM, J.
In this dependency case, father appeals a judgment entered after a permanency hearing. The juvenile court found that the Department of Human Services (DHS) had made reasonable efforts to make it possible for father to care for his two-year-old daughter, A, but it concluded that father had not yet made sufficient progress and declined to order placement with father or to order a family-decision meeting to implement transition of A to father's care. Father assigns error to the court's failure to so order and to its designation of a concurrent plan of guardianship. We review the record de novo, ORS 419A.200(6)(b), and we reverse the judgment of the juvenile court in part and remand the case for further proceedings.
Both parents were minors when A was born in February 2005. In April 2006, when A was a little over one year old, DHS filed a dependency petition on her behalf. That petition alleged that mother's "mental health problems interfere with her ability to parent and protect [A]," that mother "has an anger control problem," that mother "has a history of residential instability," and that mother "has been the perpetrator of domestic violence, some of which has taken place in front of the child." The petition alleged that father, who had been named by mother as A's biological parent but whose legal paternity had not yet been established, was "presently unable to provide a home or care for the child." The court conducted a shelter care hearing the day the petition was filed and placed A in the care of her maternal great-grandmother.[1] At some point, mother was detained, and she remained in the custody of the Oregon Youth Authority at Hillcrest Youth Correctional Facility at the time of the permanency judgment at issue in this case.
In May, father was served with a summons to appear at an adjudication hearing on the petition. Before the adjudication hearing, DHS filed an amended petition replacing the previous allegation against father with the allegations that he "lack[ed] a parental relationship with the child and need[ed] the services of the Court and the Department of Human Services in order to be a custodial resource," and that he "[wa]s aware of [] mother's mental health problems and ha[d] not taken adequate steps in order to protect the child."
At the adjudication hearing in June 2006, the court took jurisdiction over A based on mother's stipulations that mother "has a history of mental health problems [that] interfere with her ability to parent and protect [A]" and that she "has a history of criminal activity and problems with anger control that have resulted in acts of domestic violence, some of which ha[ve] taken place in front of [A]." The court made no findings with respect to the allegations against father, but it instructed him to start filiation proceedings. The court continued the hearing for several months to allow father to pursue paternity testing. See ORS 419B.305 (adjudication hearing may be continued upon written order supported by factual findings of good cause).
*868 At the continuation of the adjudication hearing in September 2006, father admitted to the allegations of the amended petition. The court entered a judgment of jurisdiction that identified the permanent plan as "return to parent" and the concurrent plan as "adoption." See ORS 419B.343(2)(b) (requiring DHS to include a "concurrent permanent plan" in its case plan in the event that a ward cannot be returned to his or her parent, except when the plan is something other than reunification).
Following that hearing, A's maternal great-grandmother filed a motion to intervene on the basis of her caregiver relationship with A. See ORS 419B.116. DHS objected to her intervention, contending that "[p]etitioner seeks intervention because she wants custody of the child," which DHS believed would have a negative effect on case planning and would not be in A's best interests. The court granted intervenor's motion after the parties stipulated to certain conditions of intervenor's participation.
Father's legal paternity had still not been established when the court held a review hearing in November 2006. At that hearing, the court found that father "wishes to parent," but "not enough information [was] available to assess" his ability to do so, particularly considering that his legal paternity had still not been established.
Following the review hearing, DHS moved for genetic testing, explaining that mother had repeatedly named father as A's biological father, that father had complied with all the requirements of DHS's paternity testing program, and that mother had refused to cooperate with the testing. DHS requested that the court order a "motherless draw" of genetic material from A and father to establish paternity, and the court granted the motion.
Genetic testing was performed on the day of the next review hearing in February 2007. At that hearing, the court found that father had completed parenting classes, was in school, had the support of his family, and was beginning to form a relationship with A, who was then two years old. The court set a permanency hearing for April 2007.
The results of the genetic testing confirmed that father is A's biological parent, and DHS moved to establish his legal paternity under ORS 419B.395 and ORS 109.258. The court entered a general judgment establishing father's paternity a few days before the permanency hearing.
At the permanency hearing in April 2007, DHS proposed that the permanent case plan be to place A with father. Father noted that he had attended every parenting class, had successfully completed all his assignments, and had received excellent comments from the parenting class instructor. A's attorney expressed concern about father's commitment to parenting A independently of father's mother, but she noted that she "definitely saw more of a commitment from him than I had been feeling previously." Mother requested that the court order a psychological evaluation for father because "there is something going on here that is concerning," but offered no further explanation. Intervenor agreed with mother that father should submit to a psychological evaluation and noted that some of the visits between father and A "have been a little concerning," specifically referring to an incident where father returned a diaper bag with dirty clothing inside.[2]
The trial court expressed concern "that it's going to be impossible for this child to grow up as a healthy kid and then adult if the tension and the disagreement and the behavior that goes on between her parents continues." Father was ordered to submit to a psychological evaluation. The trial court continued the hearing until July to give the parties an opportunity to review information about father and A's interactions and mother's progress in her treatment program.
*869 At the continuation of the permanency hearing in July 2007, DHS maintained that the permanency plan should be to place A with father and specifically recommended that the court not adopt a concurrent case plan. The agency informed the court that it believed that father can parent effectively, "given what he has done in finishing all that has been asked of him with [parenting training], through his school, his work with DHS, and [that] he has embraced the hands-on parent trainer in the home." The caseworker also explained that father "has done everything in the jurisdictional order" that was required of him. DHS requested that the court hold a hearing in 60 days to endorse A's placement with father.
Also at the July 2007 hearing, A's attorney informed the court that father had done all that has been asked of him, and "has great comments from the parent trainer about how he's doing," but nevertheless continued to express concern that father would not act as the primary parent if A were placed in his care. Father's mother testified at the hearing that father would indeed be the primary parent because of her demanding work schedule.
Father requested that the plan be to return child to father, with a family-decision meeting to create a time line to transition A to his care. He noted that he had successfully participated in all services, that he was developing an emotional bond with A, and that he had a good support network in place to assist him in parenting A. Father also explained that he would soon graduate from high school, that he was seeking a position with health benefits and a retirement plan, and that he was on a waiting list for his own apartment.[3] Noting that his psychological evaluation showed that he was capable of parenting safely, father asked that A be reunited with him "as soon as possible."[4]
Intervenor requested that the trial court change the concurrent plan from adoption (the concurrent plan established at the September 2006 adjudication hearing) to guardianship. She expressed concern that A had displayed what someone had described to her as a "gang sign" and that father had reportedly been a victim of a recent shooting. She contended that father's demonstration that he can parent in a structured environment and his love for and bond with A was not sufficient to support returning A to his care. The court agreed, explaining that
"[t]he plan at this point has to be return to parent, but I can't tell you what that means. I don't know how that plays itself out. I suppose in a way I'm extending the time to achieve permanency for both parents, and I'm extending the time to come up with a concurrent plan, which may be the viable plan. I'm not eliminating at this point any of the options in terms of permanency, and frankly the urgency to land on a plan is not so great in this case that we frequently have because this child is attached to the people who are involved in her life and have raised her to this point, so I'm not worried that this child is going to suffer foster care drift or have disruptions in attachment or all of those reasons that lie behind [the Adoption and Safe Families Act, or ASFA] and lie behind our obsession with coming up with a permanent plan.
"* * * * *
"* * * I can't say that we're moving forward with a placement for the first time in her life with dad. He cannot minimally adequately parent at this time by himself. He's doing the work, he's doinghe's taking the classes, he'sthat doesn't magically make you reach your goal at an ASFA time line. He's not there.
"* * * * *

*870 "I'm going to say that, you know, both of the parents should continue to engage in the services that they're engaging in. Both of the parents have at least another six months, which takes us to the end of when now he thinks he's going to be done with high school, which may beI don't know, nobody's giving me any time frames about mom, and let's see what's going on at that point.
"The concurrent plan is guardianship. It just is."
The court clarified that the plan remained to "return [A] to a parent," but not necessarily to place A with father. A review hearing was set for December 2007, and the court entered a permanency hearing judgment on July 31, 2007.[5]
In that judgment, the court found that "[f]ather has complied w[ith] services," including a "psych[ological] eval[uation]," and that "[m]other is making good progress in treatment at Hillcrest," but that neither parent's progress was "sufficient to make it possible for [A] to safely return home." The court also found that DHS had made reasonable efforts to make it possible for A to return home. In addition, the court made the following findings:
"[A] is well cared for in great grandmother's home. Father is cooperative [and] doing well in services, but the Court does not find that he is currently able to parent on his own. He is young, was uninvolved in child's early life, [and] contributed to mother's loss of control.[[6]] Mother is in Hillcrest [and] doing well. The Court cannot at this time approve a plan to transition child to father's care. Mother cannot currently assume custody. Child is well attached [and] it is not in her best interests to move her nowmore time is needed to determine best plan."
In addition to those factual findings, the juvenile court ordered that mother "continue compliance w[ith the] program at Hillcrest [and] work toward release [and] after-care" and that father "continue involvement in services [and] efforts to independently parent."[7] The court also ordered that A is "to be returned to the parent(s)," stating, "The anticipated date of return and transition plan [is] unclear."[8] (Emphasis omitted.)
Father appeals the permanency hearing judgment, assigning error to the trial court's "not returning the child to the care of [her] father * * * and in designating a concurrent plan of guardianship of the child." Child[9] responds that father's appeal is moot. Child further argues that, even if it is not moot, the judgment is unappealable because it did not adversely affect father's rights or duties. See ORS 419A.200(1) (providing a party may appeal from a final juvenile court judgment that adversely affects that party's *871 rights and duties). Child also argues on the merits that the juvenile court did not err because father did not prove that she could be safely placed in his care.
We first consider whether father's appeal is moot in the context of Oregon's dependency statutes. In December 2007, six months after the judgment appealed from in this case, the juvenile court apparently held a review hearing and entered a review order declining to place A with father. Respondent argues that, because the trial court "heard additional argument for return of the child to father and declined to do so," the December 2007 review order rendered the July permanency judgment moot. We disagree.
Because the dependency statutes contemplate multiple hearings before permanency is achieved, subsequent review hearings in a juvenile dependency case do not necessarily render an appeal from a permanency hearing judgment moot. The relevant inquiry is whether the judgment from which a parent appeals continues to "have some practical effect on the rights of the parties." Barcik v. Kubiaczyk, 321 Or. 174, 182, 895 P.2d 765 (1995) (internal quotation marks omitted), appeal after remand, 139 Or.App. 498, 912 P.2d 408 (1996). Thus, the question before us is whether the court's entry of a review order in December means that the July 2007 permanency hearing judgment no longer had a practical effect on the rights of the parties.
The July 2007 judgment and the court's choice of permanent plan had a practical effect on whether and under what circumstances father could parent A. The December 2007 review order merely continued the status quo. See State ex rel. Juv. Dept. v. Vockrodt, 147 Or.App. 4, 934 P.2d 620 (1997) (dismissing an appeal from an order following a review hearing that continued wardship and made no new or additional disposition to which parent assigned error); State ex rel. Juv. Dept. v. Nagle, 36 Or.App. 237, 240, 584 P.2d 338 (1978) ("There was merely a supervisory look at an ongoing wardship with no substantial change ordered."). Accordingly, father's appeal from the July 2007 permanency hearing judgment was not rendered moot by the later review order.[10]
Child also argues that the July 2007 permanency hearing judgment is not appealable because it merely continued A's wardship and did not adversely affect father's rights. See ORS 419A.200 (permitting appeals by persons "whose rights or duties are adversely affected by a judgment of the juvenile court"). More specifically, respondent child contends that father "did not ask for an immediate return [of A] nor make any motion on which the court ruled," so the court's failure to return A to his care is not appealable. See Vockrodt, 147 Or.App. at 8, 934 P.2d 620. We disagree.
Although father did not ask the court to terminate A's wardship, he did ask that the permanency plan "specifically return [A] to father" and that the court order "a family decision meeting to create a solid return home plan with good timelines." The court denied those specific requests, noting that it had not decided whether it would return A to mother or father, and used the word "unclear" when describing the anticipated date of return. By requesting to be identified as A's permanent placement and requesting a family decision meeting to effect that transition, father sought affirmative relief. See State ex rel. Dept. of Human Services v. S.P.B., 218 Or.App. 97, 103, 178 P.3d 307 (2008) (appeal not moot where juvenile court denied a parent's request for affirmative relief); State ex rel. SOSCF v. Imus, 179 Or. App. 33, 36-39, 39 P.3d 213 (2002) (discussing application of ORS 419A.200 standard of appealability); State ex rel. Juv. Dept. v. Black, 101 Or.App. 626, 792 P.2d 1225 (1990) (denial of affirmative relief renders an order appealable). The court's permanency hearing judgment denied father the relief that he sought. He was therefore adversely affected by the judgment and may bring this appeal. S.P.B., 218 Or.App. at 103, 178 P.3d 307.
*872 We turn to the merits of father's appeal. We review the record de novo to determine whether a preponderance of the evidence supports the juvenile court's permanency hearing judgment. ORS 419A.200(6)(b); State ex rel. Juv. Dept. v. Brown, 175 Or.App. 1, 11-12, 27 P.3d 502, rev. den., 332 Or. 558, 34 P.3d 1176 (2001) (clear and convincing evidence standard does not apply to permanent placement findings).
We begin by reviewing the relevant portions of the statutes governing permanency hearings. At a permanency hearing, the court must determine "whether and, if applicable, when * * * [t]he ward will be returned to the parent," ORS 419B.476(5)(b)(A), whether DHS has made reasonable efforts to reunite the family and whether "the parent has made sufficient progress" for the ward to be safely placed in the parent's care, ORS 419B.476(2)(a). When the court determines that the permanency plan should be to return the ward to his or her parent, the court must also identify in its disposition "the services in which the parents are required to participate, the progress the parents are required to make and the period of time within which the specified progress must be made." ORS 419B.476(5)(c).
Father contends that the court erred by finding that he has failed to make sufficient progress to parent A. In explaining why it so found, the juvenile court agreed with the intervenor:
"Maybe you're right, maybe this is a function of immaturity and age, and if that's the case, then people outgrow it over time. I haveI do not believe, in spite of his cooperation, which I appreciate and think is wonderful, and the work that [he has] done in services, I do not believe that [father] is currently capable of parenting this child on his own. I simply don't believe that that's the case, and it may be that there hasn't been enough practice before, it may be that father is young, it may be that you have to start at a later date in her development because you weren't involved in the beginning of her life. It may be that seventeen and eighteen-year-old kids have things they'd rather be doing than be parents, but the fact of the matter is until all of this blew up, that what [mother] was doing, and we're kind of talking as if she, you know, doesn't have a role in the future of this child's life, and that concerns me tremendously."
The record before us does not support the juvenile court's finding that father is unable to parent A now. The juvenile court's emphasis on father's youth, without evidence that his age poses some risk of harm to A, does not support a finding that he is not currently capable of parenting. Although the record contains some evidence that father "antagonized" mother, the record also contains evidence that father ceased such conduct at the direction of the court and DHS. Particularly where the parenting class trainer and DHS believe that he has acquired minimally adequate skills, we are unable to discern, from the record before us, why the juvenile court concluded that father was not able to parent A. The record contains only unsupported assertions to that effect.
In addition to gaining parenting skills, father's previous lack of involvement in A's life has been remedied, and he has developed a parental relationship with the child. A putative father's lack of involvement with a child prior to establishing his paternity cannot serve as a basis for a finding that he is unable to parent. See State ex rel. Dept. of Human Services v. Rardin, 340 Or. 436, 446, 134 P.3d 940 (2006). Moreover, the evidence does not reveal a basis for the court's concern that father would not be A's primary caregiver. Father's mother testified that, although she and other family members would support his efforts to parent A, father would be primarily responsible for A's care, and father agreed that that was his plan.
On de novo review, we conclude that the record does not support the finding that father is not "currently able to parent on his own." The DHS caseworker's report that father can parent on his own and that he "has done everything in the jurisdictional order that has been asked of him," including building a parental relationship with A, supports the opposite finding. We therefore find that father currently is capable of parenting A and that he has completed the *873 required services. Accordingly, we reverse the portion of the trial court's judgment that orders father to continue his involvement in services and indicates that the "anticipated date of return and transition plan [is] unclear." Instead, the anticipated date of return and transition should be the earliest reasonable date determined by a family-decision meeting to be held at the first available opportunity. We affirm the remainder of the July 2007 judgment.
Reversed in part; remanded with instructions to enter a permanency judgment consistent with this opinion; otherwise affirmed.
NOTES
[1] As discussed below, A's maternal great-grandmother was later granted intervenor status. See ORS 419B.116 (describing the requirements for intervention in a dependency proceeding and intervenors' limited rights of participation).
[2] The caseworker explained that A had soiled the clothes immediately before the visited ended, and that father did not have any clean clothing but would have clean clothing available in the future. The caseworker reiterated that father was not "careless about the care of the child." Intervenor also informed the court that there had been some "transport issues" because the transport worker picked up and returned A late. Nothing in the record suggests that those "transport issues" can be attributed to father.
[3] The DHS caseworker noted that the agency's position relied, in part, on the fact that father resided with his mother, who could support his parenting efforts, and that it would reassess its position if father were to move out.
[4] The court expressed concern that the psychological evaluation did not consider father's "role in [mother's] current circumstances" of being confined in a youth correctional facility. However, the record before us does not conclusively reveal the circumstances resulting in mother's confinement or how father may have contributed to the commission of her offense(s).
[5] The permanency hearing judgment also designated a concurrent permanency plan of guardianship. ORS 419B.343(2)(b) requires DHS to include a concurrent permanent plan in its case planning where the permanent plan is to place a ward with his or her parent. ORS 419B.343(2) ("Except in cases when the plan is something other than to reunify the family, the department shall include in the case plan * * * [a] concurrent permanent plan to be implemented if the parent is unable or unwilling to adjust the parent's circumstances, conduct or conditions in such a way as to make it possible for the ward to safely return home within a reasonable time." (Emphasis added.)) Although father assigns error to that designation, he offers no argument as to why that designation was erroneous, and he does not explain what he believes the concurrent plan should be. We therefore decline to review that aspect of his assignment of error. See Davis v. Brockamp & Jaeger, Inc., 216 Or.App. 518, 531 n. 12, 174 P.3d 607 (2007) ("[T]hat argument is not sufficiently developed on appeal, and we decline to consider it.").
[6] We are not sure to what "loss of control" the court was referring. We construe this as a reference to the allegations of the petition regarding mother's mental health issues and her anger management problem that resulted in acts of domestic violence, some of which were witnessed by A. The record does not reveal what those acts were.
[7] The trial court failed to identify in its disposition "the services in which [father is] required to participate, the progress [he is] required to make and the period of time within which the specified progress must be made." ORS 419B.476(5)(c).
[8] The juvenile court used the form judgment, but it added the word "unclear" to indicate the anticipated date of return.
[9] The state declined to participate in this appeal, but child's attorney submitted a respondent's brief.
[10] In light of that conclusion, we deny respondent's pending motion to dismiss petitioner's appeal.